[779 NYS2d 168]

RUBY EMANUEL, Individually and as Administratrix of the Estate of JAMES EMANUEL, Deceased, Respondent-Appellant, v SHERIDAN TRANSPORTATION CORP. et al., Defendants, and AMERADA HESS CORPORATION et al., Appellants-Respondents.

SHERIDAN TRANSPORTATION CORP., Third-Party Plaintiff, and AMERADA HESS CORPORATION et al., Third-Party Plaintiffs-Appellants, v G. MARINE DIESEL CORP., Third-Party Defendant-Respondent, et al., Third-Party Defendant.

First Department, May 4, 2004

### APPEARANCES OF COUNSEL

*Carol R. Finocchio* and *Hill Betts & Nash, LLP (Gregory O'Neill* and *James M. Hazen* of counsel), for appellants-respondents.

*Pollack, Pollack, Isaac & DeCicco (Brian J. Isaac* of counsel), and *Kenneth Heller* for respondent-appellant.

*William M. Kimball* and *James P. O'Connor* for respondent.

### OPINION OF THE COURT

TOM, J.

On December 3, 1992, the barge ST 114, a merchant vessel allegedly owned by defendant Hygrade Operators Inc. (Hygrade) and operated by defendant-appellant-respondent Spentonbush/ Red Star Companies, Inc. (Spentonbush), was transporting oil off the northeast coast of the United States when it was grounded in an area known as "stepping stones" and suffered damage to its hull. The Coast Guard conducted an investigation and directed the barge to discharge its cargo and make permanent repairs before being allowed to operate or load cargo again. On December 16, 1992, the barge entered the shipyard of third-party defendant G. Marine Diesel Corp. (G. Marine) in the Brooklyn Navy Yard for dry-docking. G. Marine quoted Spentonbush prices for dry-docking and repairs, and, more particularly, G. Marine quoted a price to hook up and disconnect a gangway. On December 17, 1992, the barge was placed in a dry-dock space, all the water pumped out, and the barge was resting on cement blocks that had timbers placed on top of those blocks.

Plaintiff's decedent, James Emanuel, was a rigger employed by G. Marine. After the barge was placed in dry dock, G. Marine's rigging foreman instructed Emanuel to place the gangway, provided by G. Marine, between the barge and dry dock. According to the foreman, he told Emanuel to walk around the dry dock while a crane swung the gangway over into place

and did not assign anyone to ride the gangway. However, G. Marine's marine engineer, Thomas Gibson, who was on board the barge and discussing repair work with the captain of the barge when the accident occurred, saw Emanuel standing in the center of the gangway, holding on to its side rails, as the crane attempted to land it on the barge.

According to Gibson, the only eyewitness, the gangway, which had rope at both ends, was being placed in position when Emanuel yelled to the captain to "tie up the gangway." The captain, whose back was facing Emanuel, kept talking to Gibson. The gangway touched the barge deck for a few seconds and then suddenly shot out, and Emanuel plummeted approximately 45 feet to the bottom of the dock, sustaining massive injuries that rendered him a quadriplegic and ultimately led to his death on August 30, 1994.

Plaintiff, individually and as administratrix of Emanuel's estate, brought this action against, inter alia, Hygrade, its agent, Spentonbush, and defendant-appellant-respondent Amerada Hess (Hess). Hess and Spentonbush, inter alia, commenced a third-party action against Emanuel's employer G. Marine and its successor in interest, FCE Industries Ltd. After plaintiff's causes of action pursuant to the Jones Act and Labor Law § 240 and the third-party complaint against G. Marine were dismissed, a bifurcated jury trial ensued. The trial court found that Hess owned the barge and dismissed the action against defendant Hygrade.

At the liability trial, Emanuel's foreman, Roger Jones, the supervisor who instructed the rigging crew that day, testified that he put tag lines on each end of the gangway for the purpose of securing each end and that a vessel's captain or first mate would grab the lines on the end that went on the vessel and would lash them off before the lines on the dock were secured. That was their job. Consistent with this practice, Jones told Emanuel, a novice at rigging, that after the crane swung the gangway over, he should yell to the barge's captain and tell him to lash the gangway off, and Emanuel complied with this instruction.

Plaintiff's maritime expert witness, John Cartner, maintained that the barge, though emptied of its cargo and dry-docked for repair, remained in navigation and should have been manned by at least two crew members in accordance with the certificate of inspection issued by the Coast Guard. He further testified that while the shipyard provided the crane, according to customary

maritime practice, the obligation of securing the gangway to a vessel remained the vessel's responsibility. Cartner explained that the gangway in question has one end that has rollers, and customarily it is that end that lands on the dock. The lashing is done on the vessel's end. When the gangway is secured, the vessel's crew member customarily supervises the release of the wiring from the gangway to the crane, which is done by a shipyard person. The vessel should have two crew members to secure the lashing on its end, which should just take 15 to 20 seconds.

The defense presented the testimony of G. Marine's general manager, Joseph Ekhardt, as to the practices and procedures employed by the shipyard at the time of the accident. Ekhardt testified that once a vessel enters the graving dock it becomes the responsibility of the shipyard. The shipyard's procedure for rigging a gangway was that the gangway would be hooked to the crane on the pier and the crane operator would lift it to the vessel. The roller end would land on the vessel and the gangway would be secured on the pier. When this was complete, the rigger would release the wires attaching the gangway to the crane. The guidelines on the ends of the gangway have nothing to do with lashing. The vessel crew has nothing to do with the placement of the gangway, which is the responsibility of the shipyard. However, the general manager was not present on the accident date and did not know how the gangway was rigged that date. He did not know if the roller end was placed on the barge or dock, and he never discussed with the riggers what they did that day.

At the liability trial, the jury found the barge unseaworthy and Hess and Spentonbush negligent. At the damages trial, the jury awarded plaintiff the principal amount of $24,967,660, which the trial court reduced to $7,613,566. Plaintiff consented to the remittitur under protest.

Hess and Spentonbush appeal and plaintiff cross-appeals from the judgment. The judgment brings up for review an order of the same court and Justice which dismissed plaintiff's Jones Act and Labor Law § 240 claims.*

---

* Plaintiff's cross appeal also brings up for review (1) so much of an order which granted the motion of Hess and Spentonbush to set aside the verdict to the extent of ordering a new damages trial on the issues of preimpact terror, pain and suffering, and loss of services and society, unless plaintiff stipulated to reduce the jury's verdict as to damages from $2 million to $100,000,

*(n. cont'd)*

We now hold that the trial court erred when it submitted to the jury the issue of seaworthiness, which it intertwined with the issue of negligence, and erred in its instructions on the issue of negligence. We therefore remand the case for retrial in accordance with this opinion.

Although plaintiff claims the order dismissing her claim brought pursuant to the Jones Act is brought up for review by the appeal from the judgment, she makes no specific argument that the court erred in dismissing that claim. To the extent that plaintiff does raise this claim, we find that she did not establish that Emanuel qualified as a seaman under the Jones Act.

The Jones Act confers a cause of action on "[a]ny seaman" who suffers a "personal injury in the course of his employment" (46 USC Appendix § 688 [a]). The act provides "heightened legal protections . . . [to] seamen . . . because of their exposure to the 'perils of the sea' " (*Chandris, Inc. v Latsis*, 515 US 347, 354 [1995] [citations omitted]). To prove "seaman status," an employee must establish his or her (1) " 'employment-related connection,' " (2) " 'to a vessel in navigation' " (*Tonnesen v Yonkers Contr. Co., Inc.*, 82 F3d 30, 32 [1996] [quoting *McDermott Intl., Inc. v Wilander*, 498 US 337, 355 (1991)]). An "employment-related connection" to a vessel exists if two conditions are satisfied: First, the "worker's duties must contribute to the function of the vessel or to the accomplishment of its mission"; second, the worker's connection to the vessel must be "substantial in both its duration and its nature" (*Tonnesen*, 82 F3d at 32 n 2; *see Chandris*, 515 US at 368). The second inquiry focuses on whether the plaintiff derives his livelihood from sea-based activities. The *Chandris* court has described this inquiry as "status based: Land-based maritime workers do not become seamen because they happen to be working on board a vessel when they are injured, and seamen do not lose Jones Act protection when the course of their service to a vessel takes them ashore" (*Chandris*, 515 US at 361). The Jones Act does not protect workers with "only a transitory or sporadic

$20 million to $5 million, and $2,225,000 to $650,000, respectively; (2) an order which denied her motion to modify a prior order which denied her an award of preverdict interest; (3) so much of an order which denied her an award of preverdict interest, denied her request to restore the jury damage verdict award, and otherwise denied entry of her proposed judgment; and (4) an order which denied her an award of preverdict interest and denied her request to restore the jury damage verdict award. Plaintiff also maintains that the cross appeal brings up for review a "Consent to Remittitur Under Protest."

connection to a vessel in navigation" (*id.* at 368). Here, Emanuel's connection to the barge was not sufficiently "substantial in terms of both its duration and its nature" (*Chandris*, 515 US at 368) to support the conclusion that he qualifies as a seaman (*see also Norfolk Shipbuilding & Drydock Corp. v Garris*, 532 US 811, 817-818 [2001]).

On appeal, defendants argue that the warranty of seaworthiness was abolished, except as to claims under the Jones Act, by the 1972 amendment to the Longshore and Harbor Workers' Compensation Act (LHWCA) and, therefore, this issue should not have been given to the jury.

The LHWCA "establishes a comprehensive federal workers' compensation program that provides longshoremen and their families with medical, disability, and survivor benefits for work-related injuries and death" (*Howlett v Birkdale Shipping Co.*, 512 US 92, 96 [1994]). "[E]mployee[s]" eligible for LHWCA benefits include "any person engaged in maritime employment, including any longshoreman or other person engaged in long-shoring operations, and any harbor-worker including a ship repairman, shipbuilder, and ship-breaker" (33 USC § 902 [3]).

In 1972, the LHWCA was amended to overrule *Seas Shipping Co. v Sieracki* (328 US 85 [1946]). *Sieracki* extended a shipowner's obligation of seaworthiness, a strict liability doctrine, to longshoremen. Consequently, the right of longshoremen to sue nonemployer vessel owners was not barred by the LHWCA, which dealt exclusively with longshoremen's rights vis-à-vis their employers. As amended, the LHWCA provides that non-seaman maritime workers who receive no-fault workers' compensation payments from their employers for injuries sustained in the course of their employment are precluded from seeking any other remedy against their employers (33 USC § 905 [a]). In addition, a longshoreman's right to recover against a vessel owner pursuant to the strict liability doctrine of seaworthiness was abolished. Instead, the right to recover from a vessel owner was limited solely to a negligence action (*see* 33 USC § 905 [b]; *see also Scindia Steam Nav. Co., Ltd. v De Los Santos*, 451 US 156 [1981]). Section 905 (b) provides in relevant part that the "liability of the vessel under this subsection shall not be based upon the warranty of seaworthiness or a breach thereof at the time the injury occurred. The remedy provided in this subsection shall be exclusive of all other remedies against the vessel except remedies available under this Act." Congress, by amending this statute, sought to encourage "safety within

the industry by placing the duty of care on the party best able to prevent accidents" (*Munoz v Flota Merchante Grancolombiana, S.A.*, 553 F2d 837, 839 [1977]).

Here, plaintiff does not dispute that Emanuel was covered under the LHWCA and has received federal workers' compensation benefits from his employer. Therefore, plaintiff was precluded from suing G. Marine and was limited to a claim of negligence against Hess and Spentonbush. Thus, the issue of seaworthiness should not have been presented to the jury.

Parenthetically, the 1972 amendment also precluded third-party actions by the vessel's owner against a longshoreman's employer: "and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void." (33 USC § 905 [b].) Accordingly, the court properly dismissed defendant's interpleader action against G. Marine (*see also Fragedis v Farrell Lines*, 64 NY2d 987 [1985]).

Plaintiff, relying on *Blancq v Hapag-Lloyd A.G.* (986 F Supp 376, 382 [1997] [quoting *Sieracki*]), makes a tortured argument that the exclusivity of the statutory remedy provisions does not absolutely preclude a claim of unseaworthiness and that there are pockets of workers who are neither seamen nor longshore workers. However, plaintiff's contention wholly ignores that Emanuel fell squarely within the longshoreman category and squarely outside that of seaman, hence the proper dismissal of the Jones Act claim. Moreover, plaintiff availed herself of the exclusive remedy under the LHWCA, thus barring any claim in strict liability against defendants.

Section 905 (b) specifically states that "[i]n the event of injury to a person covered under this Act caused by the negligence of a vessel . . . such person . . . may bring an action against such vessel as a third party" (33 USC § 905 [b]; *see also O'Hara v Weeks Mar., Inc.*, 294 F3d 55, 62 [2002]). The LHWCA does not define negligence for the purpose of actions against third-party vessel owners under section 905 (b). But in *Scindia Steam Nav. Co., Ltd. v De Los Santos* (451 US 156 [1981], *supra*), the Supreme Court articulated federal common-law standards to guide judicial determinations of liability under this subsection, articulating three duties of care owed by vessel owners to longshoremen, to wit, the "turnover duty," the "active control duty" and the "duty to intervene" (*see Gravatt v City of New York*, 226 F3d 108, 121 [2000], *cert denied sub nom. Gravatt v Simpson & Brown, Inc.*, 532 US 957 [2001]).

Under the turnover duty, "before turning over the ship or any portion of it to the stevedore [or other contractor employing nonlongshoring harbor workers], the vessel owner must exercise 'ordinary care under the circumstances to have the ship and its equipment in such condition that an expert and experienced stevedore will be able by the exercise of reasonable care to carry on its cargo operations with reasonable safety' " (*id.* at 120-121 [quoting *Scindia*, 451 US at 167]). This also imposes on vessel owners a duty to warn longshoremen or other contractors of hazards of which the vessel owner knows or should know and which are unknown or would not be obvious to the stevedore (*id.*).

Under the active control duty, "once stevedoring operations [or other operations by a contractor] have begun, the vessel [owner and others falling within the statutory definition of 'vessel'] will be liable 'if it actively involves itself in [those] operations and negligently injures a longshoreman [or other harbor worker],' " or if the owner acts negligently with respect to hazards " 'in areas, or from equipment, under the active control of the vessel during the stevedoring [or contractor's] operation' " (*Gravatt*, 226 F3d at 121 [quoting *Scindia*, 451 US at 167] [emphases omitted]).

Under the duty to intervene, "[w]ith respect to obvious dangers in areas under the principal control of the stevedore, the vessel owner [and others falling within the statutory definition of 'vessel'] must intervene if it acquires actual knowledge that (1) a condition of the vessel or its equipment poses an unreasonable risk of harm and (2) the stevedore [or other contractor] is not exercising reasonable care to protect its employees from that risk" (*id.*, citing *Scindia*, 451 US at 175-176).

Here, the court's jury instructions on the issue of negligence did not accurately reflect the law in the aftermath of the LHWCA's 1972 amendment and did not comport with *Scindia*. The court instructed the jury as follows:

> "The operator of a ship owes a duty of using reasonable care and providing a place to work on board the ship. This duty means that the operator must be responsible for conditions in existence when the operations begin.

> "In order to prevail on the claim of negligence, the plaintiff must establish [th]at first the operator knew of, or by the exercise of reasonable care, could

have discovered the condition on board the ship that le[ ]d to the accident.

"Second. That the operator knew or should have known that the condition would pose an unreasonable risk of an accident.

"Third. That the operator failed to exercise reasonable care to protect against the accident."

This charge instructed the jury on the standard of care a vessel operator owes to a plaintiff before the plaintiff's employer begins operations and not on the distinct standard of care a vessel owner owes to a plaintiff *after* the plaintiff's employer begins its operations on the vessel. The "creation of a shipowner's duty to oversee the stevedore's activity and insure the safety of the longshoremen would . . . saddle the shipowner with precisely the sort of nondelegable duty that Congress sought to eliminate by amending section 905 (b)" (*Hurst v Triad Shipping Co.*, 554 F2d 1237, 1249 n 35 [1977], *cert denied* 434 US 861 [1977]). Thus, the court's instruction improperly placed primary responsibility for safety on the vessel owner and its agents, rather than on Emanuel's employer (*see Scindia, supra*; *Kakavas v Flota Oceanica Brasileira, S.A.*, 789 F2d 112, 119-120 [1986], *cert denied* 479 US 853 [1986] [court did not properly put to the jury what the law now is]). The court should have charged the jury in accordance with Modern Federal Jury Instructions-Civil (part V, ch 5 [4.13]), that:

"If, after the plaintiff's employer began operations on the vessel, the defendant actively involved itself in those operations, it is liable if it failed to exercise reasonable care in doing so, and such failure was the cause of plaintiff's injuries.

"If, after the plaintiff's employer began operations on the vessel, the defendant maintained control over equipment or over an area of the vessel on which the plaintiff could reasonably have been expected to go in the performance of his duties, the defendant must use reasonable care to avoid exposing the plaintiff to harm from the hazards the plaintiff reasonably could have been expected to encounter from such equipment or in such area.

"If, after the plaintiff's employer began its operations on the vessel, the defendant learned that an

apparently dangerous condition existed (including a condition which existed before the plaintiff's employer began its operations) or has developed in the course of those operations, the defendant vessel owner must use reasonable care to intervene to protect the plaintiff against injury from that condition only if the plaintiff's employer's judgment in continuing to work in the face of such a condition was so obviously improvident that the defendant should have known that the condition created an unreasonable risk of harm to the plaintiff. In determining whether the plaintiff's employer's judgment is 'so obviously improvident' that the defendant should have intervened, you may consider that the plaintiff's employer has the primary duty to provide a safe place to work for plaintiff and its other employees, and that the defendant ordinarily must justifiably rely upon the plaintiff's employer to provide his employees with a reasonably safe place to work. In determining whether the defendant justifiably relied upon the decision of the plaintiff's employer to continue the work despite the condition, you should consider the expertise of the plaintiff's employer, the expertise of the defendant, and any other factors which would tend to establish whether the defendant was negligent in failing to intervene into the operations of the plaintiff's employer."

While the error in the negligence charge warrants reversal of the judgment, it cannot be determined, as a matter of law, that Hess and Spentonbush did not breach their active control duty under *Scindia* to supervise and participate in the securing of the gangway. Thus, we depart from our dissenting colleague's view that the complaint must be dismissed in its entirety because the jury verdict was not supported by sufficient evidence as a matter of law.

Under the active control duty of *Scindia*, a shipowner must exercise reasonable care to prevent injuries to longshoremen in areas that remain under the active control of the vessel. Although the shipowner has no duty to supervise or inspect the repair operations of the ship repairer because the primary responsibility for the safety of the ship repairmen rests with the repairer (*Scindia*, 451 US at 168), a postturnover duty may arise if the vessel owner is obligated to monitor by contract,

statute or custom (*see e.g. Keller v United States*, 38 F3d 16, 32 [1994]). Indeed, the plain language of *Scindia* suggests that custom alone is sufficient to create a duty owed by a vessel to a longshoreman (*see e.g. England v Reinauer Transp. Cos., L.P.*, 194 F3d 265 [1999]).

Plaintiff's expert testified that maritime custom and practice obligated a vessel's captain to supervise the placement of the gangway and lash it to the vessel. Emanuel's foreman testified that his actual instructions to Emanuel were in conformity with that practice in that he told Emanuel that, after the crane swung the gangway over the barge, he should yell to the captain and tell him to lash the gangway off. The marine engineer who witnessed the accident testified that Emanuel followed these instructions, yelling out to the captain to lash the gangway to the barge. He also testified that the captain, whose back was to Emanuel, did not do so and continued the conversation. While the shipyard's general manager testified that the shipyard's established practices differed, this raises a credibility issue, particularly where it conflicted with his own foreman's testimony. In this regard, we should bear in mind that the foreman is the one who supervises the entire rigging project. It cannot be said that the foreman or plaintiff's expert's testimony was incredible as a matter of law, and a factual question exists as to whether the barge's captain had concurrent control over the placement of the gangway and breached his active control duty. The general manager's testimony that the roller end was to be placed on the vessel and that only the dockside end had to be lashed, does not require otherwise. This testimony conflicted with the testimony of G. Marine's foreman and plaintiff's maritime expert. G. Marine's foreman testified that the gangway can be lashed on either end. Plaintiff's expert testified that the gangway had to be lashed on the vessel's side. Significantly, the general manager had no personal knowledge of the actual procedures employed on the date of the accident. That the shipyard's quote included a hook-up fee for its work in attaching the gangway does not, as a matter of law, abrogate an obligation, as urged by plaintiff, of the barge's captain, who remained on board, to supervise and assist in lashing the gangway to the barge. This presents a question of fact for the jury's determination.

We cannot agree with the dissent's conclusion that there was no evidentiary support for the jury to find the shipowner liable, based on the custom and practice, when a ship is in dry dock.

Contrary to the dissent's contention that the record is silent with respect to the placement of the gangway when the ship is in dry dock, the foreman was asked "[w]hen the vessel is on the blocks, and all the water is gone and the deck of the block is lower than the dry dock wall, don't the rollers go on the barge deck which is the lower part?" He responded, "[i]t can be switched and sometimes you leave the rollers on the pier" and that "[s]ometimes we leave the rollers on the pier. It all depends." Here, the foreman's testimony was specific concerning the vessel while it was in dry dock. He also testified that it was not necessary to place the rollers on the lower end as the shipyard's general manger contended.

Thus, contrary to the opinion of our dissenting colleague, the general manager's testimony that only the shipyard was responsible for securing the gangway raised only an issue of fact, and his testimony that the particular gangway used required lashing only on the dock side was controverted, rendering the customary practice as urged by plaintiff as to the securing of the gangway on the vessel side relevant. Accordingly, issues of fact concerning whether the barge owner breached its active control duty under *Scindia* under these circumstances are for the jury to determine.

Cases cited by the dissent, such as *Meserole v M/V Fina Belgique* (736 F2d 147 [1984]) and *Duplantis v Zigler Shipyards, Inc.* (692 F2d 372, 375 [1982]), do not require dismissal. There, the only evidence in the record was that the contractor bore responsibility for the work related to the plaintiff's injury. Furthermore, the limited scope of the custom alleged in this case—that a vessel, whose captain remains aboard, retains responsibility for lashing the gangway, an appurtenance to the ship in accordance with custom and practice—would not in any way contravene the overarching principle enunciated in *Scindia* that vessel owners are not responsible for generally overseeing contractors.

Whether decedent's conduct in riding the gangway was a superseding intervening cause also presents a question of fact for the jury. An intervening act will be deemed a superseding cause and will serve to relieve the defendant of liability when the act is of such an extraordinary nature or so attenuates defendant's negligence from the ultimate injury that responsibility for the ultimate injury may not be reasonably attributed to the defendant (*see Kush v City of Buffalo*, 59 NY2d 26, 33 [1983]). The question of whether Emanuel's conduct warrants dismissal of

the action should only be resolved by the court, as a matter of law, when it is clear that the only cause of the accident was the conduct of plaintiff's decedent which was both reckless and unforeseeable (*see Boltax v Joy Day Camp*, 67 NY2d 617 [1986]).

Here, the foreman testified that Emanuel did not leave aboard the gangway. Since this conflicts with what the marine engineer saw, an issue of fact exists as to when Emanuel actually boarded the gangway. Further, although the foreman may have told Emanuel to walk, he did not expressly tell him not to ride the gangway, and a question exists as to whether Emanuel's conduct in doing so was foreseeable. A factual issue is also raised to the extent of whether it was permissible for Emanuel to ride the gangway since the rigging supervisor also testified that when a man rides the gangway out to the ship, the ship's captain supervises him. Moreover, since there is testimony that the gangway touched the barge's deck, that securing the gangway prevents it from sliding and that the barge's deck was scratched after the accident, questions of fact also exist as to whether the captain's failure to assist in lashing it or to monitor its placement was a proximate cause of decedent's injuries. These factual issues must be determined by the jury.

Plaintiff argues that in the event any part of the liability verdict in plaintiff's favor is reversed, the Labor Law cause of action should be reinstated. However, the Supreme Court properly dismissed plaintiff's cause of action pursuant to Labor Law § 240. Indeed, "state law may not be applied where it would conflict with maritime law" (*Floyd v Lykes Bros. S.S. Co., Inc.*, 844 F2d 1044, 1047 [1988]; *see also Tibak v City of New York*, 154 AD2d 313, 314 [1989], *lv denied* 75 NY2d 705 [1990] [whether federal maritime law governs is determined by whether accident had a maritime location and a significant relationship to traditional maritime activity]).

Plaintiff's reliance on *Cammon v City of New York* (95 NY2d 583 [2000]) is misplaced. There, defendant City owned and operated the Marine Transfer Station and the plaintiff was injured performing "local land-based" repair. (*Id.* at 590.) The Court therefore held that under those particular circumstances "where the tort was maritime but local and there are no far-reaching implications for vessels, seafarers or entities engaged in maritime commercial transactions, there is no threat to the uniformity of Federal maritime law sufficient to displace application of an important State health and safety measure" (*id.*). Here, in stark contrast, Emanuel's injury was not land-

based and, equally significant, defendants are not landowners, as was the defendant in *Cammon*. Accordingly, we cannot say that, in accordance with *Cammon*, the implications for vessels are not far-reaching under the inapposite facts presented here.

We need not reach the parties' remaining contentions in light of our determination.

Accordingly, the judgment of the Supreme Court, New York County (Leland DeGrasse, J.), entered June 27, 2001, to the extent it awarded plaintiff, after a jury trial, damages in the principal amount of $7,613,566, should be reversed, on the law, without costs, the judgment vacated and the matter remanded for a new trial in accordance with this opinion.

MARLOW, J. (dissenting in part). While I agree with the majority that the court erred in submitting the issue of seaworthiness to the jury and in giving an improper jury charge, I must dissent from the majority's conclusion that the matter be remanded for a new trial. Based on my review of this 5,600 page record, I find no evidence to support the jury's finding of negligence against defendants-appellants-respondents Amerada Hess Corporation (Hess) and Spentonbush/Red Star Companies, Inc. (Spentonbush). Accordingly, I would dismiss the complaint as to them.

The Longshore and Harbor Workers' Compensation Act ([LHWCA] 33 USC § 905 [b]) does not set forth what specific acts or omissions by a vessel owner constitute negligence. However, in defining the scope of a vessel's owner's negligence, the United States Supreme Court has held that "[i]t would be inconsistent with the Act to hold . . . that the shipowner has a continuing duty to take reasonable steps to discover and correct dangerous conditions that develop during the loading or unloading process. Such an approach would repeatedly result in holding the shipowner solely liable for conditions attributable to the stevedore,[1] rather than the ship" (*Scindia Steam Nav. Co., Ltd. v De Los Santos*, 451 US 156, 168-169 [1981]). Keeping these limitations of liability in mind, the Supreme Court in *Scindia* (451 US at 172) defined a shipowner's duty, absent a contract provision, positive law, or custom to the contrary, as follows:

---

1. A stevedore is an "[i]ndividual or firm employing longshoremen for the purpose of loading and unloading a vessel" (Captain W.H. Atkins, Modern Marine Terminal Operations and Management, at 320). However, *Scindia*'s rationale is not limited to stevedore operations. Rather, "[i]t clearly applies to any independent contractor and its harborworker employees covered by the LHWCA and working aboard ship" (*Hill v Texaco, Inc.*, 674 F2d 447, 451 [1982]).

"the shipowner has no general duty by way of supervision or inspection to exercise reasonable care to discover dangerous conditions that develop within the confines of the cargo operations that are assigned to the stevedore. The necessary consequence is that the shipowner is not liable to the longshoremen for injuries caused by dangers unknown to the owner and about which he had no duty to inform himself. This conclusion is plainly consistent with the congressional intent to foreclose the faultless liability of the shipowner based on a theory of unseaworthiness or nondelegable duty. The shipowner, within limits, *is* entitled to rely on the stevedore, and owes no duty to the longshoremen to inspect or supervise the cargo operations."

Thus, as a general rule, a shipowner may rely on the longshoremen's employer to avoid exposing its employees to unreasonable risks; the LHWCA requires the employer to provide a reasonably safe workplace and to take such safeguards with respect to equipment and working conditions necessary to avoid injury to its employees (*id.* at 170). Indeed, the "ship is not the common employer of the longshoremen and owes no such statutory duty to them" (*id.*).

Despite this limited scope of liability, plaintiff nevertheless claims that Hess and Spentonbush were negligent in failing to discover a condition which should have been discovered, to wit, that the captain failed to intervene in securing the gangway. Contrary to plaintiff's contention, Hess and Spentonbush, pursuant to *Scindia*, had no duty to intervene based on constructive knowledge of a dangerous condition. Rather, Hess and Spentonbush must have possessed actual knowledge of a dangerous condition before a duty will be imposed (*see Helaire v Mobil Oil Co.*, 709 F2d 1031 [1983] [once loading operations have begun, vessel owner liable for injuries to employees of stevedore resulting from open and obvious dangers only in event of actual knowledge of danger and actual knowledge that the owner cannot rely on stevedore to remedy situation; owner not held to a duty to discover condition or anticipate its danger]; *see also Meserole v M/V Fina Belgique*, 736 F2d 147 [1984] [record contains nothing indicating that vessel's crew was involved in or had actual knowledge of hazard that caused plaintiff's injury]).

Initially, we observe that the act of securing the gangway did not itself create a dangerous condition; rather Emanuel's act of

being on the gangway before it was properly secured created the dangerous condition, one over which Hess and Spentonbush had no control. In any event, G. Marine agreed to take the barge into dry dock and conduct repairs. The record is devoid of any evidence that the barge was delivered to G. Marine in an unsafe condition, other than the need for repairs to its hull, which had nothing to do with the happening of the accident at issue (*see Elberg v Mobil Oil Corp.*, 1991 WL 353438 [SD Ill 1991], *affd* 967 F2d 1146 [1992] [no evidence that shipowner failed to exercise ordinary care in turning over vessel to plaintiff's employer for repairs and owner entitled to assume repair company would act reasonably concerning safety of its own employees]). Hess and Spentonbush, having hired G. Marine to repair the barge, were "under no duty to protect [Emanuel] from risks that were inherent in the carrying out of the contract" (*West v United States*, 361 US 118, 123 [1959]; *see also Munoz v Flota Merchante Grancolombiana, S.A.*, 553 F2d 837, 841 [1977] [shipowner cannot be held liable in damages when he relinquishes control of the "hold,"[2] then in reasonably safe condition, to experienced stevedore pursuant to contract to supply services within its normal competence]).

As part of this repair process, G. Marine charged a fee to hook up and remove a gangway, which G. Marine provided. Indeed, there is nothing in the record to suggest that Hess and Spentonbush had any responsibility for securing the gangway, a "necessary first step" for G. Marine to undertake before it performed the necessary repairs (*see Meserole, supra* at 149 [owner entitled to rely on contractor to perform its repair work properly including "necessary first steps" of cleaning the damaged engine room and providing scaffolding]; *Stass v American Commercial Lines, Inc.*, 720 F2d 879, 884 [1983], citing *Duplantis v Zigler Shipyards, Inc.*, 692 F2d 372, 375 [1982], and *West, supra*, 361 US at 123 [cleaning areas to be repaired on incoming barges was "a necessary first step in doing the work" and the slippery footing was a risk "inherent in the carrying out of the contract" for repairs]).

Moreover, there would be no way that Hess and Spentonbush could have anticipated that Emanuel would, in contravention of his supervisor's instructions, be on the gangway before it was properly secured to the barge, without a plan as to how it would

---

**2.** "Hold: a large compartment below decks in a ship mainly for the storage of cargo" (The Oxford Companion to Ships and the Sea, at 391 [P. Kemp ed 1976]).

be secured (*see Munoz, supra*, 553 F2d at 840 [shipowner had no duty to supervise minute details of work totally entrusted to competence of stevedore]). As to plaintiff's contention that the vessel captain was negligent in failing to see what there was to be seen, the sole eyewitness's uncontroverted testimony was that the barge's captain had his back to the happening of the accident. There is no indication in the record that the captain knew that the gangway rigging was underway, that he saw Emanuel on the gangway, or that he heard Emanuel call out to "Go ahead . . . [a]nd tie up the gangway." Even if it can be inferred from the testimony that the captain heard this remark, there is no support in the record for a finding that this remark was directed at him, as opposed to G. Marine personnel. Finally, as the events unfolded in a matter of seconds, even if the captain heard the remark and the remark was directed at him, there was no time for him to react. Thus, we find the record devoid of any evidence that Hess and Spentonbush had actual knowledge of a dangerous condition.

Plaintiff further maintains that custom and practice established a duty of care upon Hess and Spentonbush. Specifically, plaintiff maintains that there was sufficient testimony adduced at trial by G. Marine's rigging supervisor to allow a jury to conclude that it was the job of a ship's captain and chief mate to grab the tag line and lash off the gangway of a vessel in dry dock. However, according to G. Marine's general manager, G. Marine was responsible for taking a vessel into dry dock and for rigging and placing the gangway, and the vessel's crew had no responsibility for placing and securing the gangway.

Despite this conflict in testimony from which the jury could reasonably draw very different conclusions, Hess and Spentonbush adduced uncontroverted testimony describing how this particular gangway was rigged. Specifically, the crane operator[3] was to lower one end of the gangway onto the pier, then lower the other end of the gangway, which had a roller on the end, onto the barge, and then the gangway on the pier side would be lashed off. Accordingly, the rigging of this particular gangway required lashing only on one end—the end placed on the pier. Thus, even if, as plaintiff contends, it was customary for a vessel's crew to secure that end of the gangway which was placed on the vessel, here, the uncontroverted evidence demonstrated that the gangway did not require securing on the gangway's

---

**3.** There does not appear to be any explanation in the record why the crane operator did not testify at trial.

vessel end. Plaintiff's expert testified that when a vessel is floating in the water, the vessel and its cargo move up and down as the tide changes and as ships pass. Therefore, the roller end of the gangway is customarily placed on the pier side (instead of the vessel side) apparently to protect the pier from resulting damage. Plaintiff's expert ultimately concluded that when a gangway is placed on board a vessel and the gangway is not lashed down on the vessel side, the vessel is not reasonably fit for the purpose for which it is intended. However, this conclusion presupposes facts which were not before the jury, namely that the vessel was floating on water when the gangway was put down. The record is silent as to any expert opinion about custom and usage specifically when, as in this case, a gangway is placed on a vessel in dry dock, resting on cement blocks while the gangway was placed between the vessel and the pier—thus at a time when the vessel was not subject to the water's up and down motion as tides change and ships pass. Therefore, regardless of the rigging supervisor's testimony referred to by the majority, there was no evidentiary support for this jury to find Hess and Spentonbush liable based on custom and practice, since here the vessel was in dry dock.

Consequently, G. Marine's rigging supervisor's testimony, which presupposed that the gangway needed to be secured on both the vessel and pier sides by custom and practice, was irrelevant to the facts of this case. Thus, plaintiff failed to establish that Hess and Spentonbush assumed any duty based on custom and practice.

Plaintiff also attempts to create an argument that Hess and Spentonbush were negligent because the barge was undermanned after it had aborted its voyage at the Coast Guard's direction and had been accepted into G. Marine's dry dock for the purpose of undergoing extensive repairs to its hull. Indeed, the barge was prohibited from continuing its voyage until repairs were completed and inspected. However, to the extent that this argument can in any way be considered as anything other than arising from a claim of unseaworthiness, it is without merit.[4] The documents in evidence establish that the barge did not have to be manned at all, but could be "permissively" manned at the owner's option. While Hess and Spentonbush did elect to have a two-person crew while the barge was at sea with cargo, once the barge was in dry dock, the crew was relieved

---

4. Indeed, plaintiff admittedly and frequently intermingles the distinct concepts of negligence and seaworthiness.

and a captain placed on board. According to Coast Guard policy, once the vessel was in dry dock, it did not have to be manned, but could have a single crew member on board to conduct routine maintenance. Even crediting plaintiff's claim that the barge, even while in dry dock, was required to have a crew of two on board, Hess and Spentonbush cannot be held liable. Plaintiff's own expert testified that the purpose of having a two-member crew was to permit one person to sleep while the other remained on watch. Thus, Hess's and Spentonbush's failure to assign a two-member crew to the barge while in dry dock can in no way be considered a proximate cause of the accident (*see Palsgraf v Long Is. R.R. Co.*, 248 NY 339 [1928]; *Pena v Schur*, 245 AD2d 206 [1997], *lv denied* 91 NY2d 811 [1998]; *Kelly v Great Neck Union Free School Dist.*, 192 AD2d 696 [1993], *lv denied* 82 NY2d 658 [1993]).

Finally, the fact that Emanuel was on the gangway in contravention of his employer's contemporaneous instructions was itself a superseding, intervening cause of the accident and clearly supports my position to relieve Hess and Spentonbush of any liability. Indeed, where an act is of such an extraordinary nature or so attenuated from a defendant's conduct, responsibility for the injury cannot be reasonably attributed to the defendant (*see Derdiarian v Felix Contr. Corp.*, 51 NY2d 308 [1980]; *see also Prysock v Metropolitan Transp. Auth.*, 251 AD2d 308 [1998], *lv denied* 92 NY2d 817 [1998] [motorist's conduct in driving car onto railroad tracks without room to safely pass over them was so reckless as to constitute an intervening and unforeseeable action which broke any causal nexus between her injuries and defendant's alleged negligence]). Here, "only one conclusion may be drawn from the established facts and . . . the question of legal cause may be decided as a matter of law" (*Derdiarian, supra*, 51 NY2d at 315).

I find the record contains no evidence that Hess and Spentonbush had any actual knowledge of a dangerous condition or that the custom and practice of securing a gangway imposed any duty upon them. Thus, the "jury verdict is not supported by sufficient evidence as a matter of law" (*Nicastro v Park*, 113 AD2d 129, 132 [1985]) as "there is simply no valid line of reasoning and permissible inferences which could possibly lead rational men to the conclusion reached by the jury on the basis of the evidence presented at trial" (*Cohen v Hallmark Cards*, 45 NY2d 493, 499 [1978]). Accordingly, I would reverse the finding of liability against Hess and Spentonbush and dismiss the complaint as to them.

NARDELLI, J.P., and FRIEDMAN, J., concur with TOM, J.; MAR-LOW, J., dissents in part in a separate opinion.

Judgment, Supreme Court, New York County (Leland De-Grasse, J.), entered June 27, 2001, reversed, on the law, without costs, the judgment vacated and the matter remanded for a new trial in accordance with this opinion.