[863 NYS2d 164]

Jᴀᴍᴇѕ D. Lᴇᴇ, Appellant, v Aѕᴛᴏʀɪᴀ Gᴇɴᴇʀᴀᴛɪɴɢ Cᴏᴍᴘᴀɴʏ, L.P., et al., Respondents and Third-Party Plaintiffs-Respondents. Eʟʟɪᴏᴛᴛ Tᴜʀʙᴏᴍᴀᴄʜɪɴᴇʀʏ Cᴏ., Iɴᴄ., et al., Third-Party Defendants-Respondents.

First Department, August 12, 2008

## APPEARANCES OF COUNSEL

*Hofmann & Associates,* New York City (*Paul T. Hofmann* and *Timothy F. Schweitzer* of counsel), for appellant.

*Mauro Goldberg & Lilling LLP,* Great Neck (*Deborah F. Peters* and *Caryn L. Lilling* of counsel), and *Robin, Harris, King & Fodera,* New York City, for Astoria Generating Company, L.P. and others, respondents.

*Lester Schwab Katz & Dwyer, LLP,* New York City (*John Sandercock* and *Steven B. Prystowsky* of counsel), for Elliott Turbomachinery Co., Inc. and another, respondents.

Acosta, J.

The issue in this case is whether the barge containing an electricity generating turbine upon which plaintiff was working when he was injured is a "vessel" under the Longshore and Harbor Workers' Compensation Act (LHWCA) (33 USC § 901 *et seq.*), thereby precluding plaintiff from pursuing an action ultimately against defendants (collectively Astoria), the owners of the barge, other than for negligence. We hold that the barge was not a vessel, and therefore, plaintiff's Labor Law § 240 (1) and § 241 (6) claims against Astoria are not precluded by the LHWCA. Alternatively, we hold that even if the barge were a vessel, federal maritime jurisdiction would not preempt these claims in any event.

On April 16, 2001, plaintiff, an employee of Elliott Turbomachinery Co., Inc. and Elliott Company (collectively Elliott), injured his back while performing work as a millwright at the Gowanus Gas Turbine electric generation facility in Brooklyn, a facility that is owned and operated by Astoria.

The Gowanus facility is an electrical power generating station consisting of land-based structures as well as four barges, each of which houses eight gas turbine electrical generating units (*see Matter of Consolidated Edison Co. of N.Y. v City of New York*, 44 NY2d 536 [1978]). The mechanical parts of these turbines move inside cylindrical steel turbine "shells." The shells are housed within steel box-like enclosures called "exhaust wells," which are affixed to the deck of the barges. The side walls to the exhaust wells are approximately 15 feet high. Access hatches, known as "stack hatches" or "sniffers," are located on top of the exhaust wells. The distance from the stack hatch opening in the top of the exhaust well down to the top of the steel shell inside is about six to eight feet. The primary purpose of a stack hatch or sniffer is to do visual inspection from above and for gas detection; it was not designed for entry to perform major work.

The barges are connected to the power grid and are ready to produce electricity. They are moved to a drydock for periodic maintenance, which is generally done approximately once a decade. They are capable of being moved for the purpose of providing electric power at other locations. Barge No. 1, the barge where plaintiff was injured, as well as one of the other barges, was moved to Astoria, Queens in 1996 so that its generators could provide electric power following a

fire at a generating station there that left the area without sufficient power. Although the barges were returned to their present location approximately three months later, they can be moved if the need arises.

Third-party defendant Elliott is a corporation based in Pennsylvania that overhauls and maintains steam turbines used for the generation of electric power. Elliott entered into a contract with Astoria/Orion to perform an overhaul of the turbines. According to Joseph Vasquez, the general manager of the facility, the turbines were undergoing a "major overhaul" rather than normal maintenance, but not because of any kind of damage in particular (record at 348). Elliott's work involved disassembling the entire turbine, shipping parts of it back to its shop in Pennsylvania for restoration or replacement, and returning it to the site. There, Elliott's millwrights reassembled the turbines.

On the day of the accident, plaintiff was working on a turbine on barge No. 1. He was ordered by his supervisor to enter the turbine's exhaust well through the stack hatch to weld some fixtures inside. Plaintiff used a long metal extension ladder to get to the top of the exhaust well. He then entered the hatch opening by grasping its sides and lowering his body, feet first, down to the top of the steel cylindrical turbine shell. From there, he was to climb down to the base of the exhaust well, but his feet slipped out from under him and he fell eight feet to the base of the exhaust well, injuring his back. There is no indication in the record that plaintiff was provided a ladder for use inside the well, a safety harness or any other type of safety device.

The normal means of entry into an exhaust well was through a hole cut with an acetylene torch into the exhaust well's steel side walls. Earlier in the renovation such a hole had been cut, but the day before the accident, the side panel had been welded back onto the unit despite the fact that the welding job to which plaintiff had been assigned was not completed.

As a result of the accident, plaintiff was awarded benefits under the LHWCA because he was injured on "navigable" waters. The LHWCA "establishes a comprehensive federal workers' compensation program that provides longshoremen [and harbor workers] and their families with medical, disability, and survivor benefits for work-related injuries and death" (*Howlett v Birkdale Shipping Co.*, 512 US 92, 96 [1994]; 33 USC § 903), regardless of fault. This statute provides that workers who

receive no-fault workers' compensation payments from their employers for injuries sustained in the course of their employment are precluded from seeking any other remedy against their employers (33 USC § 905 [a]; *Emanuel v Sheridan Transp. Corp.*, 10 AD3d 46, 51 [2004]).

An injured worker may bring an action against a third-party owner of the vessel without losing his or her workers' compensation rights (*Howlett*, 512 US at 96; *see Emanuel*, 10 AD3d at 51). However, the nature of the action against the owner depends on whether the craft upon which the employee was working was a vessel. If the craft is a vessel, 33 USC § 905 (b) generally limits recovery under maritime law to the third-party owner's own negligence only (*see Scindia Steam Nav. Co. v De los Santos*, 451 US 156 [1981]).

The legislative history of the LHWCA is very clear as to why this is so. As enacted, the employer's liability for compensation under the LHWCA was to be exclusive. The LHWCA (33 USC § 933 [a]) provided that if a third party was liable in damages for the employee's injuries, the employee could recover against the third party. Nineteen years after the enactment of the LHWCA, the Supreme Court held, in *Seas Shipping Co. v Sieracki* (328 US 85 [1946]), that a longshoreman could recover from a third-party shipowner for the vessel's unseaworthiness (a claim based on strict liability for the stevedoring company's negligence). The Court then held in *Ryan Stevedoring Co. v Pan-Atlantic S. S. Corp.* (350 US 124 [1956]) that the shipowner could recover full indemnity for any amount paid on the *Sieracki* claim because of an implied warranty of workmanlike service running from the stevedore employer to the shipowner (*see* Force and Norris, The Law of Maritime Personal Injuries § 8:13 [5th ed]). Thus, the *Sieracki-Ryan* rule effectively eliminated the "exclusive and in place of all other liability" provision of the LHWCA (*id.*). Concerned over this development, the stevedores' insurance companies appealed to Congress. Noting that "*vessels* by their superior economic strength could circumvent and nullify the provisions of Section 5 of the Act [codified at 33 USC § 905] by requiring indemnification from a covered employer for the employee injuries" (HR Rep 92-1441, 92d Cong, 2d Sess, reprinted in 1972 US Code Cong & Admin News, at 4698, 4704 [emphasis added]), Congress overruled the *Sieracki-Ryan* rule for "vessels" with the 1972 addition of section 905 (b).

A vessel is "any watercraft practically capable of maritime transportation, regardless of its primary purpose or state of transit at a particular moment" (*Stewart v Dutra Constr. Co.*, 543 US 481, 497 [2005]). Notwithstanding this expansive definition, not all watercraft are vessels. In determining whether a structure qualifies as a vessel, it is necessary to examine the structure's purpose and the business in which it is engaged (*see Pavone v Mississippi Riverboat Amusement Corp.*, 52 F3d 560, 570 [5th Cir 1995]). *Pavone* held that a floating casino did not constitute a vessel where the casino was moored "in a semi-permanent or indefinite manner" (*id.* at 570). The Fifth Circuit's decision was based in large part on the fact that the barge had never been used as a seagoing vessel to transport cargo, passengers or equipment, as well as the barge's substantial dockside attachment to land. Furthermore, the purpose of the barge was a land-based enterprise (casino), and it was not engaged in maritime commerce.

A decade after *Pavone*, the United States Supreme Court addressed the issue of whether a dredge is a vessel under the LHWCA in *Stewart v Dutra Constr. Co.* (543 US 481 [2005], *supra*). Citing *Pavone,* the Court noted that while a structure's use or capability of use as a means of transportation is a major factor in considering whether a craft is a vessel, the inquiry does not end there. Rather, as a practical matter, when a ship is permanently moored or otherwise rendered incapable of movement, the craft will not be considered a vessel for maritime law purposes (*id.* at 494).

If the craft is not a vessel, neither the express language of the LHWCA nor its legislative history prevents plaintiff from pursuing a New York Labor Law claim against the third-party owner of the craft, even if the claims are based on strict liability. The LHWCA "preserves to covered employees any remedy that otherwise exists against third parties, including those that arise under state law" (Force and Norris § 8:1).

> "If on account of a disability or death for which compensation is payable under this chapter the person entitled to such compensation determines that some person other than the employer or a person or persons in his employ is liable in damages, *he need not elect whether to receive such*

*compensation or to recover damages against such third person"* (33 USC § 933 [a] [emphasis added]).[1]

Congress's concern over a vessel's superior economic strength relative to stevedores by forcing the latter to indemnify the owners simply does not apply to circumstances where the craft is not a vessel.

Here, plaintiff asserted State Labor Law claims (Labor Law §§ 200, 240 [1]; § 241 [6]) against Astoria, the owner of the barge, for his injuries. Astoria subsequently filed a third-party complaint against Elliott seeking indemnification.

Citing the LHWCA (33 USC § 905 [a]),[2] Elliott moved for summary judgment dismissing the complaint and the third-party complaint, arguing, inter alia, that it is immune from suit under federal law and that plaintiff's claims were preempted by federal maritime law. Astoria cross-moved for summary judgment, also arguing that plaintiff's claims were preempted and that, in any event, plaintiff failed to state a claim against it under the Labor Law. In the alternative, Astoria sought summary judgment granting it a defense and conditional indemnification from Elliott based on what it maintained was an indemnification provision contained in the contract between them.

Plaintiff opposed the motions, arguing that his Labor Law claims were not preempted by federal law because the barge upon which he was injured is not a "vessel" as that term has

1. A covered employee can still sue non-vessel-owner third parties under general maritime law tort principles (Cheavens, *Terminal Workers' Injury and Death Claims*, 64 Tul L Rev 361, 364 [1989], citing *Melerine v Avondale Shipyards, Inc.*, 659 F2d 706, 708 [5th Cir 1981] and *Harrison v Flota Mercante Grancolombiana, S.A.*, 577 F2d 968, 977 [5th Cir 1978]). In *Chandris, Inc. v Latsis* (515 US 347, 356 [1995]), the Supreme Court cited Cheavens in noting that injured workers such as a vessel's crew members, who are covered employees under the LHWCA, "may still recover under an applicable state workers' compensation scheme or, in admiralty, under general maritime tort principles."

2. Section 905 (a) provides in relevant part:

"The liability of an employer prescribed in section 904 of this title shall be exclusive and in place of all other liability of such employer to the employee, his legal representative, husband or wife, parents, dependents, next of kin, and anyone otherwise entitled to recover damages from such employer at law or in admiralty on account of such injury or death, except that if an employer fails to secure payment of compensation as required by this chapter, an injured employee, or his legal representative in case death results from the injury, may elect to claim compensation under the chapter, or to maintain an action at law or in admiralty for damages on account of such injury or death."

been defined (*see Stewart v Dutra Constr. Co.*, 543 US 481 [2005], *supra*; *Pavone v Mississippi Riverboat Amusement Corp.*, 52 F3d 560 [1995], *supra*), inasmuch as it is permanently anchored, is connected to city utilities, lacks propulsion equipment, does not serve a transportation function, and was built as an extension of a land-based activity. Therefore, he maintains substantive maritime law does not apply.

The court granted the motions and dismissed the complaint primarily on its holding that the barge was a vessel and thus the action was subject to maritime law.

■ Contrary to the motion court, we hold that the structure in question is not a "vessel." An overview of the physical characteristics as well as the purpose of the Gowanus Gas Turbine generating station all lead to the conclusion that the power barge upon which plaintiff was injured is not a vessel.

The barges on the Gowanus site, which undeniably float, are nonetheless attached to piers at the facility by way of spud beam clamping systems, which allow the barges to rise and fall with the tide. The barges are connected to New York City water pipes, and the electrical power lines of the barges run to the Con Ed substation that abuts the property. Their only movement over water is to a drydock for periodic maintenance, which is done approximately once a decade. The barges arrived at the site in about 1969, and Astoria maintains it has no intention to move any of the barges for any reason other than periodic maintenance (*see Kathriner v UNISEA, Inc.*, 975 F2d 657 [9th Cir 1992]). The electricity created at the facility is conveyed over Astoria's and Con Ed's power line transmission system to Con Ed's nearby Brooklyn and Queens customers.

Moreover, the turbine facility, whose sole purpose is to provide electrical power to these neighborhoods, is permanently moored, serves no ancillary maritime purpose, and was not intended to operate as a vessel in navigation. The facility receives its utilities from shore, and as noted, provides power via lines that run from the barge to the Con Ed substation. The facility is not self-propelled, and was designed and intended to be a power plant, not a means of water transportation or maritime commerce (*see De La Rosa v St. Charles Gaming Co.*, 474 F3d 185 [5th Cir 2006] [boat not a vessel where its intended use was as an indefinitely moored floating casino]). Indeed, in *Matter of Consolidated Edison Co. of N.Y. v City of New York* (44 NY2d 536 [1978]), decided prior to Astoria's purchase of the facility, the Court of Appeals found that these very barges were the

functional equivalent of land-based structures, and taxation of them as realty, not personalty, was proper. Moreover, electricity from the turbines can only be produced with the communication, remote start, fire protection, fuel, water, and power lines connected to the Con Ed substation, a land-based structure. The barge's attachments to Con Ed's land-based substation render the barge's capability to move theoretical rather than practical (*Stewart*, 543 US at 494).

Inasmuch as plaintiff's action against Astoria is not governed by maritime law, his claims are subject to New York State's Labor Law (*Florida Fuels, Inc. v Citgo Petroleum Corp.*, 6 F3d 330, 332 [5th Cir 1993]; *Holland v Sea-Land Serv., Inc.*, 655 F2d 556, 559 [4th Cir 1981]; *see generally Victory Carriers, Inc. v Law*, 404 US 202 [1971]). The dismissal of plaintiff's section 240 (1) and section 241 (6) claims was thus not warranted under maritime law principles.[3] Accordingly, upon a search of the record, this Court holds that plaintiff established his entitlement to partial summary judgment as to liability on his section 240 (1) claim.

Labor Law § 240 (1) creates a nondelegable duty upon property owners to provide safety equipment to protect workers against falling from a height. Under this provision, plaintiff does not have to show that Astoria had actual supervision or control over the work he was performing in order for liability to be found (*Ross v Curtis-Palmer Hydro-Elec. Co.*, 81 NY2d 494, 499-501 [1993]). That plaintiff was working on a turbine rather than a building is of no moment, inasmuch as section 240 (1) applies to all structures (*see e.g. Gordon v Eastern Ry. Supply*, 82 NY2d 555 [1993]; *Mosher v State of New York*, 80 NY2d 286 [1992]; *Lombardi v Stout*, 80 NY2d 290 [1992]).

Here, plaintiff was not given the proper equipment to lower himself approximately 15 feet to the base of the exhaust well to weld fixtures inside. The absence of proper safety equipment caused plaintiff's fall and injury. Accordingly, plaintiff established his prima facie entitlement to summary judgment, and the burden thus shifted to Astoria to raise triable issues of fact, which it failed to do. Notwithstanding Astoria's assertions to the contrary, there is no indication in the record that plaintiff's actions were the sole proximate cause of his injuries (*see Montalvo v J. Petrocelli Constr., Inc.*, 8 AD3d 173, 175 [2004]). Just

---

**3.** Astoria did not appeal the portion of the order that dismissed its third-party complaint since it was not aggrieved by the court's order dismissing plaintiff's action in its entirety.

to work on these turbines, a hole had to be cut out on the side of the half-inch-thick walls of the wells. Indeed, the panel that had been cut out of the side of the exhaust well to allow the workers' entry was welded back in place the day prior to plaintiff's injury. Furthermore, there was testimony that plaintiff complained but was essentially told that if he did not enter the well through the hatch at the top, he could pack his tools and go home.

Nor was plaintiff engaged in routine maintenance (*Aguilar v Henry Mar. Serv., Inc.*, 12 AD3d 542, 543-544 [2004] [where the work included removal and replacement of a bulwark, reconditioning wheels and shafts, installing new fendering, engine overhaul, painting and zincs, tank cleaning, and installing new deck winches, all of which was expected to take several weeks to complete]). In examining the totality of the work done on the project, the overhaul of the turbines resulted in a significant physical change to the turbine, rather than simple, routine activity that would fall outside the scope of the statute (*see Prats v Port Auth. of N.Y. & N.J.*, 100 NY2d 878, 881-882 [2003] [actively inspecting an air conditioning fan that was being overhauled]; *Joblon v Solow*, 91 NY2d 457, 465 [1998] [extending wiring within a utility room and chiseling a hole through a concrete wall]; *Velasco v Green-Wood Cemetery*, 8 AD3d 88 [2004] [replacing loose and broken slate roof tiles, cleaning gutters, installing new flashing cement and copper flashing, and repairing a roof leak]; *Mannes v Kamber Mgt.*, 284 AD2d 310 [2001] [hanging pipes from ceiling and extending them through a wall to an adjacent structure]).

This job lasted several months, with parts having to be shipped to Pennsylvania for restoration or replacement. There was nothing routine about this work (*cf. Munoz v DJZ Realty, LLC*, 5 NY3d 747 [2005]; *Esposito v New York City Indus. Dev. Agency*, 1 NY3d 526 [2003]), other than the fact that a total mechanical overhaul was performed on the massive turbines on a relatively periodic basis.

The motion court also did not analyze the facts of this case under Labor Law § 241 (6) with regard to plaintiff's claim that defendants violated the Industrial Code as it applies to vertical passages.[4] Given that plaintiff had to climb approximately 15 feet to get to the access hatch on top of the turbine's exhaust

---

4. 12 NYCRR 23-1.7 (f) provides that "Stairways, ramps or runways shall be provided as the means of access to working levels above or below ground

well, and then lower himself through the hatch onto the top of the turbine shell and down to the base of the exhaust well, during which he fell approximately eight feet, there is, at the very least, a question of fact regarding whether this section of the Industrial Code precludes an award of summary judgment to defendants. Plaintiff's description of how he had to access the work area provides evidence that is contrary to defendants' assertion that the area was at ground level, which would render this section inapplicable.

The court was correct, however, in finding that Astoria did not have supervisory control over the injury-producing activity necessary to support a finding of liability for common-law negligence or under Labor Law § 200 (*Balbuena v New York Stock Exch., Inc.*, 45 AD3d 279, 280 [2007]).

Inasmuch as maritime law is not applicable in this action, the court should not have dismissed Astoria's third-party claims for defense and indemnification without analyzing those claims under applicable state law (*see Pennisi v Standard Fruit & S.S. Co.*, 206 AD2d 290 [1994]). As Astoria did not appeal from the dismissal of its third-party claims, however, we are barred under these circumstances from granting relief to a nonappealing party (*see Hecht v City of New York*, 60 NY2d 57 [1983]).

▄ As an alternative holding, even assuming that the barge in question was a vessel, we nonetheless hold that New York's Labor Law is not preempted by federal maritime jurisdiction. "The fact that Federal maritime law is involved does not necessarily mean that State law is superseded" (*Cammon v City of New York*, 95 NY2d 583, 587 [2000]). Rather, "[i]n assessing whether the State rule is preempted, a number of factors may be considered, including whether the State rule conflicts with Federal law, hinders uniformity, makes substantive changes, or interferes with the characteristic features of maritime law or commerce" (*id.* at 588).

In analyzing these factors in a factual pattern remarkably similar to those in the instant case, the Court of Appeals in *Cammon* held that federal maritime law did not preempt New York's Labor Law. The plaintiff in *Cammon*, who was in the process of repairing a pier, was injured while working on a float stage in navigable waters that was secured to a land-based transfer station. In his complaint, he alleged violations of Labor

---

except where the nature or the progress of the work prevents their installation in which case ladders or other safe means of access shall be provided."

Law §§ 200, 240 and 241. The Court relied heavily on the "maritime but local" rule (*id.*), which allows for the application of state rules "as to certain local matters regulation of which would work no material prejudice to the general maritime law" (*Grant Smith-Porter Ship Co. v Rohde,* 257 US 469, 477 [1922]). Noting that the objective of federal maritime law was to protect workers engaged in maritime activities, the Court of Appeals held that applying New York's Labor Law to the facts presented in *Cammon* was "unlikely to disrupt Federal maritime activity" since it would not "unduly interfere[ ] with the federal interest in maintaining the free flow of maritime commerce" (95 NY2d at 589, quoting *American Dredging Co. v Miller,* 510 US 443, 458 [1994, Souter, J., concurring]). "Local regulations that do not affect vessel operations, but rather govern liability issues with respect to landowners and contractors within the State, have no extraterritorial effect" (*Cammon,* 95 NY2d at 589).

This is especially so when the health and safety of workers is involved. "[P]rotecting workers employed in the state is within the historic police powers of the State and there is no 'clear and manifest' congressional intent to preempt this state prerogative" (*Gravatt v City of New York,* 1998 WL 171491, *12, 1998 US Dist LEXIS 4886, *32 [SD NY 1998]). Moreover, strict liability statutes, such as Labor Law § 240 (1), are not necessarily inconsistent with federal maritime law (*Gravatt,* 1998 WL 171491 at *14, 1998 US Dist LEXIS 4886 at *37).

The dissent's insistence to the contrary, *Cammon* is not limited solely to claims against landowners. Although the Court there relied on New York City's landlord status, its decision was based on the activity's impact on traditional maritime commerce. We also reject the argument that Labor Law § 240 (1)'s strict liability standard conflicts with federal maritime law and should be preempted. This is especially true where, as here,

> "the tort was maritime but local and there are no far-reaching implications for vessels, seafarers or entities engaged in maritime commercial transactions (and) there is no threat to the uniformity of Federal maritime law sufficient to displace application of an important State health and safety measure, even though it may impose strict liability" (*Cammon,* 95 NY2d at 590).

Nor does our holding in *Emanuel,* where the section 240 claim was properly dismissed as in conflict with maritime law, dictate an inconsonant result. Emanuel was a rigger on an oil transport

barge (a vessel) whose cargo was discharged so that permanent repairs could be made before resuming operation. Here, as noted, plaintiff was injured on a barge connected to a land-based structure which provided a land-based service, namely electric power.

Accordingly, the order of Supreme Court, New York County (Carol Edmead, J.), entered on or about January 23, 2007, which insofar as appealed from, granted motions by defendants, the barge's owners, and by third-party defendants, plaintiff's employers, for summary judgment dismissing the complaint, should be reversed, on the law, without costs, the motions denied, plaintiff's claims pursuant to Labor Law § 240 (1) and § 241 (6) reinstated, and plaintiff granted partial summary judgment as to liability on his section 240 (1) claim.

FRIEDMAN, J. (dissenting in part). In *Stewart v Dutra Constr. Co.* (543 US 481 [2005]), the United States Supreme Court held that the term "vessel" in the Longshore and Harbor Workers' Compensation Act (LHWCA or the Act) (33 USC §§ 901-950) is broadly defined to "include[ ] every description of water-craft . . . used, or capable of being used, as a means of transportation on water" (1 USC § 3). The majority, in determining that the barge on which plaintiff was injured is not a "vessel" under the LHWCA, looks for primary guidance, not to *Stewart*, but to a readily distinguishable Fifth Circuit case decided 10 years earlier. It seems to me that our primary guide in deciding this appeal should be *Stewart* and its progeny, and the clear weight of authority since *Stewart* supports holding the barge at issue to constitute a "vessel" under the LHWCA.

Moreover, the LHWCA provides that a negligence action against a vessel owner is the "remedy . . . exclusive of all other remedies against the vessel" for injuries covered by the Act (33 USC § 905 [b]). The defendants in this action are the entities that owned and operated the barge on which plaintiff was injured. Contrary to the majority's contention that this action may go forward even if plaintiff was injured on a "vessel," the United States Supreme Court has recognized that section 905 (b) expressly preempts causes of action against a vessel owner on grounds other than negligence, such as plaintiff's claims seeking to hold defendants vicariously liable under state law. The Court of Appeals decision on which the majority relies, *Cammon v City of New York* (95 NY2d 583 [2000]), is not to the contrary, as it dealt with a claim against a landowner, not a vessel owner. Accordingly, I respectfully dissent to the extent the

majority modifies to reinstate the causes of action under Labor Law § 240 (1) and § 241 (6), which, as applied to the defendants in this action, are not premised on such defendants' negligence, but on their alleged vicarious liability as owners of the barge. I believe that the order appealed from, which rendered summary judgment dismissing the complaint in its entirety, should simply be affirmed.[1]

Plaintiff, a millwright, injured himself in the course of overhauling a power-generating turbine on a barge moored in the Gowanus Canal in Brooklyn. The barge was part of the Gowanus Power Generating Facility (the Gowanus facility), a group of turbine-bearing barges owned and operated by defendants Astoria Generating Company, L.P., Orion Power New York GP, Inc., Orion Power New York, L.P., and Orion Power New York LP, LLC (collectively, Astoria/Orion). At the time of his injury, plaintiff was working in the employ of third-party defendants Elliott Turbomachinery Co., Inc. and Elliott Company (collectively, Elliott).

In administrative proceedings before the United States Department of Labor, plaintiff prevailed on his claim against Elliott to recover statutory benefits under the LHWCA. In this action, plaintiff sues Astoria/Orion, the owner and operator of the Gowanus facility, to recover damages based on the same incident, asserting causes of action under Labor Law § 240 (1) and § 241 (6). Plaintiff adduced no evidence that any negligence of Astoria/Orion itself contributed to the causation of his accident.

I begin with a review of relevant aspects of the LHWCA, which "provides workers' compensation to land-based maritime employees" (*Stewart*, 543 US at 488 [emphasis omitted]).[2] The LHWCA provides for a covered employee's right to compensation

---

**1.** Given the absence of any evidence of negligence by defendants, I concur in the affirmance of the dismissal of plaintiff's common-law negligence and Labor Law § 200 causes of action.

**2.** The LHWCA applies (subject to exceptions not pertinent here) to claims for

> "disability or death of an employee, but only if the disability or death results from an injury occurring upon the navigable waters of the United States (including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, dismantling, or building a vessel)" (33 USC § 903 [a]).

For purposes of the LHWCA, the term "employee" is defined to mean "any person engaged in maritime employment, including any longshoreman or other person engaged in longshoring operations, and any harbor-worker

from his or her employer for a work-related injury (33 USC § 904 [a]), "irrespective of fault as a cause for the injury" (33 USC § 904 [b]), and provides that such compensation is the exclusive remedy against the employer available to the employee (33 USC § 905 [a]). In addition, 33 USC § 905 (b) provides that a covered worker whose injury was "caused by the negligence of a vessel . . . may bring an action against such vessel" to recover damages for its negligence, and that such a negligence action is the worker's "exclusive" remedy "against the vessel."[3] The United States Supreme Court has recognized that, in amending the LHWCA to add subsection (b) to section 905, "Congress' intent . . . [was] to eliminate the vessel's nondelegable duty [under prior law] to protect longshoremen from the negligence of others" (*Howlett v Birkdale Shipping Co.*, 512 US 92, 104 [1994], citing *Scindia Steam Nav. Co. v De los Santos*, 451 US 156, 168-169 [1981]; *see also* 451 US at 172 [section 905 (b) "reject(s) the notion of a nondelegable duty on the shipowner to provide a safe place to work"]; *id.* ["(T)he congressional intent (was) to foreclose the faultless liability of the shipowner based on a theory of unseaworthiness or nondelegable duty"]). Thus, 33 USC § 905 (b) "make[s] the vessel answerable [only] for its own negligence" (*id.* at 168).

Since plaintiff has prevailed on his claim for LHWCA benefits against his employer (Elliott), there can be no dispute that claims arising from the injuries he incurred in the subject incident fall within the scope of the LHWCA. Further, given the

including a ship repairman, shipbuilder, and ship-breaker," subject to certain exceptions (including one for "a master or member of a crew of any vessel") not pertinent here (33 USC § 902 [3] [G]).

3. In pertinent part, 33 USC § 905 (b) provides:

"(b) Negligence of vessel

"In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party in accordance with the provisions of section 933 of this title, and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void. . . . The liability of the vessel under this subsection shall not be based upon the warranty of seaworthiness or a breach thereof at the time the injury occurred. The remedy provided in this subsection shall be exclusive of all other remedies against the vessel except remedies available under this chapter."

It should be noted that, as used in the LHWCA, the term "vessel" includes "said vessel's owner, . . . operator, . . . master, officer, or crew member," inter alia (33 USC § 902 [21]).

aforementioned absence of evidence that plaintiff's injuries were caused by any negligent conduct by Astoria/Orion itself, the causes of action asserted against Astoria/Orion under Labor Law § 240 (1) and § 241 (6) are necessarily predicated on an owner's nondelegable duty under those statutes to see that the statutory requirements are complied with at the work site.[4] Thus, to the extent the barge on which the accident occurred was a "vessel" within the meaning of the LHWCA, holding Astoria/Orion vicariously liable for a violation of Labor Law § 240 (1) or § 241 (6) poses a stark conflict with the exclusivity provision of 33 USC § 905 (b), which, to reiterate, immunizes the owner of a "vessel" from liability to a covered worker on the basis of any theory of nondelegable duty (*see Scindia Steam*, 451 US at 172 [section 905 (b) "foreclose(s) the faultless liability of the shipowner based on a theory of unseaworthiness or nondelegable duty"]). For the reasons discussed below, it is my view that the barge in question does constitute a "vessel" under the LHWCA, and, therefore, plaintiff's causes of action under Labor Law § 240 (1) and § 241 (6) are preempted pursuant to the Supremacy Clause of the United States Constitution.

Since the LHWCA does not define the distinguishing characteristics of a vessel, the Supreme Court has held that a definition of the term set forth elsewhere in the United States Code applies to the Act (*see Stewart*, 543 US at 490).[5] That definition—as previously noted, an exceedingly broad one—is as follows: "The word 'vessel' includes every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water" (1 USC § 3).

In discussing the statutory definition of "vessel," the Supreme Court observed that "a watercraft is not 'capable of being used' for maritime transport in any meaningful sense if it has been permanently moored or otherwise rendered practically incapable of transportation or movement" (543 US at 494). The Court further noted: "Section 3 requires only that a watercraft be

---

4. The record establishes that plaintiff was working under the sole direction, supervision and control of Elliott, his employer, and contains no evidence of any negligence on the part of Astoria/Orion that may have been causally related to the accident. Given its affirmance of the dismissal of the negligence and Labor Law § 200 claims against Astoria/Orion, the majority apparently agrees with me on this point.

5. As the Supreme Court noted, although the LHWCA does contain a definition of the term "vessel" (33 USC § 902 [21]), that definition, "[r]ather than specifying the characteristics of a vessel, . . . instead lists the parties liable for the negligent operation of a vessel" (*Stewart*, 543 US at 489 n 2).

'used, or capable of being used, as a means of transportation on water' to qualify as a vessel. It does not require that a water-craft be used *primarily* for that purpose." (*Id.* at 495.) More-over, "a watercraft need not be in motion to qualify as a vessel under § 3" (*id.*). While acknowledging that "structures may lose their character as vessels if they have been withdrawn from the water for extended periods of time," the Court explained that "a structure's locomotion at any given moment" does not determine whether it has vessel status (*id.* at 496). The Court elaborated:

> "A ship long lodged in a drydock or shipyard can again be put to sea, no less than one permanently moored to shore or the ocean floor can be cut loose and made to sail. *The question remains in all cases whether the watercraft's use 'as a means of transpor-tation on water' is a practical possibility or merely a theoretical one.*" (*Id.* [emphasis added].)

In sum, under *Stewart*, a "vessel" for purposes of the LHWCA "is any watercraft practically capable of maritime transporta-tion, regardless of its primary purpose or state of transit at a particular moment," and "[d]espite [any] seeming incongruity of grouping [the craft] alongside more traditional seafaring ves-sels" (543 US at 497). Applying this standard in *Stewart*, the Supreme Court held that a massive dredge, which "moved long distances by tugboat" and "short distances by manipulating its anchors and cables" (*id.* at 484), was a vessel for purposes of the LHWCA. In subsequent decisions, watercraft that have been held to qualify as vessels under the *Stewart* standard include: a moored dormitory barge that had no means of self-propulsion and was towed by tug between project locations (*Holmes v Atlantic Sounding Co., Inc.*, 437 F3d 441 [5th Cir 2006]); a cleaning barge that had no means of self-propulsion and was moored to a riverbed (*Bunch v Canton Mar. Towing Co., Inc.*, 419 F3d 868 [8th Cir 2005]); a dredge similar to the one in *Stewart* (*Uzdavines v Weeks Mar., Inc.*, 418 F3d 138 [2d Cir 2005]); a construction barge used in the installation of an underwater sewer main (*Calcaterra v City of New York*, 45 AD3d 270 [2007]); a riverboat casino that was released from its moor-ings only for maintenance, namely, to be spun around to dislodge accumulated drift material (*Booten v Argosy Gaming Co.*, 364 Ill App 3d 697, 848 NE2d 141 [2006], *appeal denied* 221 Ill 2d 632, 857 NE2d 669 [2006]); and two riverboat casinos that were moored to shore at all times except for 200 hours of cruising per

year mandated by state gaming laws (*Harvey's Casino v Isenhour*, 713 NW2d 247 [Iowa Ct App 2006], *affd* 724 NW2d 705 [Iowa 2006], *cert denied* 551 US —, 127 S Ct 2943 [2007]).

Contrary to the majority's position, the power-generating barge on which plaintiff was injured qualifies as a "vessel" under *Stewart*, which, to reiterate, requires only that "the watercraft's use 'as a means of transportation on water' [be] a practical possibility," not "merely a theoretical one" (543 US at 496). In this case, the use of the subject barge as a means of transportation on water is plainly a practical possibility, as the barge is detached from its moorings and moved by tug to drydock for maintenance about once every 10 years. Moreover, the barge can be moved to provide power at other locations when necessary. In 1996, for example, the barge was moved to Astoria, Queens, to provide energy to that area after a fire at a generating station caused a power shortage there. After three months in Astoria, the barge was moved back to its home base in Gowanus. When the barge is moved, it serves to transport the power turbines it supports to the trip's destination.

The foregoing facts establish that the subject barge is "practically capable of maritime transportation" (*Stewart*, 543 US at 497). In the past, it has been detached from its moorings and moved to receive periodic maintenance. In addition, when needed, the barge has been moved to provide power at a location experiencing a temporary shortage and, thereafter, to be returned to Gowanus. In the future, it will again be moved to receive periodic maintenance, and it may well also be moved again to address temporary power shortages in other areas and then to return to Gowanus. Under *Stewart*, this suffices to render the barge a "vessel" for purposes of the LHWCA. It is of no moment that the barge's primary purpose is not transportation, that its movements are infrequent, or that it lacks means of self-propulsion. As the Eighth Circuit stated of a tow barge (the Frank C. Rand) that was moored in the Mississippi River for use as a restaurant, bar and gas station:

> "The Rand was 'capable of use' as a vessel, albeit under tow. While it may have been inefficient or expensive to use the Rand as a vessel, those factors do not serve to strip the Rand of its vessel status. The Rand fits 'into the category of many other vessels with similarly limited capacities.' Although the Rand probably will never 'slip her moorings' and set off toward open waters, she is nonetheless a towable

vessel capable of use as a means of transportation on water" (*United States v Templeton,* 378 F3d 845, 852 [8th Cir 2004] [citations omitted] [holding that the Rand constituted a "vessel" under a statutory definition identical in substance to 1 USC § 3]).

In considering whether the subject barge constituted a "vessel" under the LHWCA, it should be borne in mind that the question on this appeal is not whether plaintiff's claim falls within the "maritime jurisdiction," an inquiry that would involve applying a two-part test of "location" and "connection with maritime activity" (*Jerome B. Grubart, Inc. v Great Lakes Dredge & Dock Co.,* 513 US 527, 534 [1995]). Whether or not plaintiff's claim would fall within the maritime jurisdiction, his claim *does* fall within the scope of the LHWCA, which covers claims both within and without the maritime jurisdiction.[6] Since it is undisputed that the injury sued upon falls within the coverage of the LHWCA—indeed, plaintiff, having prevailed against his employer on his claim for LHWCA benefits, is estopped to assert otherwise—the only real question on this appeal is whether the barge on which the injury occurred qualifies as a "vessel" under the LHWCA, so as to render applicable to Astoria/Orion, the barge's owner, the immunity from liability without fault provided by 33 USC § 905 (b).

As discussed above, it is my view that the power barge on which plaintiff was injured constituted a "vessel" for purposes of the LHWCA under the broad standard the Supreme Court established in *Stewart.*[7] The majority's conclusion to the contrary is not warranted by the authority it cites. *Pavone v Mis-*

---

**6.** As previously noted, the LHWCA covers the "disability or death" of a covered employee "result[ing] from an injury occurring upon the navigable waters of the United States (*including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, dismantling, or building a vessel)*" (33 USC § 903 [a] [emphasis added]). Thus, claims for injuries suffered on land and *not* caused by a vessel on navigable waters may be covered by the LHWCA, even though such claims fall outside the maritime jurisdiction (*see* 46 USC § 30101 [a] ["The admiralty and maritime jurisdiction of the United States extends to and includes cases of injury or damage, to person or property, caused by a vessel on navigable waters, even though the injury or damage is done or consummated on land"]).

**7.** Since plaintiff was not required to show that his injury occurred on a "vessel" to prevail on his claim for LHWCA benefits, he is not estopped to deny that the subject barge was a vessel. Nonetheless, it is noteworthy that, in the administrative proceedings on the claim for LHWCA benefits, his counsel specifically argued that plaintiff's work on the barge "subjected [him] to a certain element of danger which comes with working on the water"; that "the

*sissippi Riverboat Amusement Corp.* (52 F3d 560 [5th Cir 1995]), the decision on which the majority places greatest emphasis, involved a moored riverboat casino that, unlike the barge here, "was joined to a shore-side building" (*id.* at 564). Moreover, there is no indication in the *Pavone* decision that the owner had any definite intention, once the riverboat was moored in its berth at the time of the subject incident, of moving the boat ever again (unless a weather emergency occurred), even for maintenance.[8] Here, by contrast, the owner plans to move the power barge to and from drydock for periodic maintenance while it remains in use. The Fifth Circuit's decision in *De La Rosa v St. Charles Gaming Co.* (474 F3d 185 [5th Cir 2006]) follows *Pavone*, and is distinguishable on the same grounds. Another case cited by the majority, *Kathriner v UNISEA, Inc.* (975 F2d 657 [9th Cir 1992]), is readily distinguishable on the ground that, as noted in *Stewart* (543 US at 494), a "large opening [had been] cut into [the] hull" of the subject structure (a floating processing plant), which rendered the structure incapable of travel over water (975 F2d at 660). Finally, *Matter of Consolidated Edison Co. of N.Y. v City of New York* (44 NY2d 536 [1978]) concerned the classification of the subject barge for purposes of its taxability by the City of New York under the Real Property Tax Law, and has no relevance to the question of whether the barge constituted a "vessel" under the LHWCA, as that federal statute has been construed by the Supreme Court.

For all of the reasons discussed above, the record establishes that (1) the LHWCA applies to plaintiff's claim, (2) the injury occurred aboard a "vessel" within the meaning of the LHWCA, and (3) the instant action is brought against the owner of that vessel. Thus, the only matter remaining for consideration is whether the exclusivity provision of 33 USC § 905 (b) preempts plaintiff's causes of action under Labor Law § 240 (1) and § 241 (6). In my view, it plainly does. As noted above, the intent of Congress in enacting section 905 (b) was specifically to exempt the owner of a vessel, in its capacity as such, from liability without fault, including liability based on any theory of nondelegable duty, for injuries befalling workers covered by the

barge rocks and moves with wind and the tide"; and that plaintiff's work was "not land-based." Plaintiff's counsel even referred to the barge as a "vessel."

**8.** While *Pavone* is cited in *Stewart*, the Supreme Court cited the case, without discussing its facts in any detail, only for the statement that the riverboat casino there at issue was not a vessel because it "was moored to the shore in a semi-permanent or indefinite manner" (543 US at 494, quoting *Pavone*, 52 F3d at 570).

LHWCA. Indeed, since the congressional intent to eliminate the non-fault liability of vessel owners "is explicitly stated in the statute's language" (*Jones v Rath Packing Co.*, 430 US 519, 525 [1977]), this is an instance of express preemption, as the Supreme Court itself has recognized:

> "[The LHWCA] provides nonseaman maritime workers . . . with no-fault workers' compensation claims (against their employer, § 904 (b)) and negligence claims (against the vessel, § 905 (b)) for injury and death. *As to those two defendants, the LHWCA expressly pre-empts all other claims,* §§ 905 (a), (b)" (*Norfolk Shipbuilding & Drydock Corp. v Garris*, 532 US 811, 818 [2001] [emphasis added]).

Because we are dealing with a federal statute that directly applies to the situation at bar and conflicts with the state law remedies invoked by plaintiff, the flexible approach to application of state law in cases also generally subject to federal maritime law, as reflected in *Cammon* (95 NY2d 583 [2000], *supra*), is out of place. Although the injury in *Cammon* was covered by the LHWCA (under which the plaintiff received benefits), the suit in state court was against the City of New York based on its ownership of the South Bronx Marine Transfer Station, where the plaintiff was injured while making repairs to a pier from a "float stage" in the water (*id.* at 586). Thus, the prosecution of the *Cammon* claims against the City under Labor Law § 240 (1) and § 241 (6) did not present any conflict with the LHWCA, in general, or with section 905 (b) thereof, in particular. Similarly, in *Olsen v James Miller Mar. Serv., Inc.* (16 AD3d 169 [2005]), in which we held that maritime law did not preempt the Labor Law claims of a plaintiff who fell through a hole in the deck of a barge while engaged in a pier-repair project, the only claims at issue on the appeal were those against Con Edison, as lessee of the pier, and Con Edison's general contractor (*see also Gravatt v City of New York*, 1998 WL 171491, *10-16, 1998 US Dist LEXIS 4886, *26-45 [SD NY 1998] [holding that Labor Law claims against City, as owner of a bridge, and Massand, an engineering firm, were not preempted, while denying motions to dismiss claims under 33 USC § 905 (b) and the Jones Act against S & B, the employer and vessel owner]). Neither *Cammon, Olsen* nor *Gravatt* addressed Labor Law claims against a party that would have fallen

within the scope of the term "vessel" as used in the LHWCA (*see* 33 USC § 902 [21]).

On point is our decision in *Emanuel v Sheridan Transp. Corp.* (10 AD3d 46 [2004]), in which we held preempted a Labor Law § 240 (1) cause of action brought by the administratrix of a shipyard worker against the owner and the operator of a vessel in drydock (*id.* at 58-59). The decedent in *Emanuel,* like plaintiff in this case, was covered by the LHWCA (*id.* at 52). The same result should follow here.

I close with the following observations. The majority holds in the first instance that plaintiff's Labor Law claims against Astoria/Orion are not barred because, in the majority's view, the barge on which plaintiff was injured was not a "vessel" within the meaning of the LHWCA. While I disagree with the majority on the question of whether the barge was a "vessel" (as discussed above), I agree with the majority that, if the barge were not a "vessel," the LHWCA would not preempt plaintiff's Labor Law claims. I have a more profound disagreement with the majority's alternative holding that, even if the barge was a "vessel" under the LHWCA (as I believe it was), the displacement of the federal statutory provision expressly barring this action can be justified by appeal to the flexible analysis used to determine the applicability of state law in situations also subject to the general federal maritime jurisdiction (*see Cammon,* 95 NY2d at 587-590). To reiterate, the majority's use of this sort of flexible analysis—which the Court of Appeals quite properly employed in *Cammon,* where the defendant was *not* sued based on its ownership of a vessel—is altogether out of place here, where the defendant is a vessel owner that the LHWCA expressly immunizes from liability on grounds other than its own negligence. Whatever flexibility we may have in harmonizing federal and state interests in other contexts, we have no authority to refuse to apply a federal statute that, by its plain terms, expressly applies to the situation at bar. Nothing in *Cammon* remotely supports the majority's view that, even if the barge was a "vessel," we may permit this action to go forward notwithstanding the express bar of a duly enacted federal statute.

For all of the foregoing reasons, I respectfully dissent as to the reinstatement of the causes of action under Labor Law § 240 (1) and § 241 (6).

MAZZARELLI, J.P., SAXE and CATTERSON, JJ., concur with ACOSTA, J.; FRIEDMAN, J., dissents in part in a separate opinion.

Order, Supreme Court, New York County, entered on or about January 23, 2007, reversed, on the law, without costs, the motions for summary judgment dismissal denied, plaintiff's claims pursuant to Labor Law § 240 (1) and § 241 (6) reinstated, and plaintiff granted partial summary judgment as to liability on his section 240 (1) claim.