694 F.2d 934
 LAMPSIS NAVIGATION LTD., As Owner of the "DROSIA," Plaintiff-Appellee,
v.
In a Cause of Exoneration From or Limitation of Liability,
Eva ORTIZ de CORTES, personal representative of
the Estate of Jesus Maria Cortes
Lobaton, Claimant-Appellant.
 No. 1118, Docket 81-7929.
 United States Court of Appeals,
Second Circuit.
 Argued June 3, 1982.
Decided Dec. 3, 1982.
 
 Edward M. Katz, New York City (Phillips & Cappiello, New York City), for appellant.
 Edward Cuddy, New York City (Poles, Tublin, Patestides & Stratakis, Theodore P. Daly, New York City, of counsel), for appellee.
 Before KAUFMAN and WINTER, Circuit Judges, and WARD, District Judge.*
 WINTER, Circuit Judge:
 
 
 1
 Eva Ortiz de Cortes ("Mrs. Lobaton"), widow and personal representative of her deceased husband, Jesus Maria Lobaton, appeals from an order of summary judgment dated September 1, 1978, entered by Judge Owen in the United States District Court for the Southern District of New York, dismissing her wrongful death claim under the Death on the High Seas Act, 46 U.S.C. Sec. 761 et seq. (1976), and related maritime laws.
 
 
 2
 We affirm.
 
 BACKGROUND
 
 3
 On December 11, 1975, the DROSIA, a vessel of Liberian registry owned by Lampsis Navigation, Ltd., capsized and sank off Cape Hatteras, North Carolina. Seventeen crew members were rescued, eight others are presumed lost at sea. Following the loss of the DROSIA, Lampsis' insurer instructed a Mr. R.J. Pitman to pay the deceased seamen's families their accrued wages and benefits and to make "ex gratia payments" (settlements) for loss of life to the seamen's dependents. Pitman, together with a representative of Lampsis, one Paul Santiago,[1] attempted to locate the families of the deceased crewmen in their home countries of Honduras, Guatemala, El Salvador and Colombia.
 
 
 4
 In January, 1976, Pitman and Santiago met with Mrs. Lobaton, a Honduran native, at her home in Colombia to effect a settlement. Although both men were present at the first meeting, Pitman was required to depart for Ecuador before the settlement was concluded. Mrs. Lobaton contends that Santiago told her during the negotiations that she did not need to engage counsel because Lampsis was adequately protecting her interests. In settlement, Santiago paid Mrs. Lobaton her deceased husband's accrued wages and an additional sum of $30,000, in return for which she executed a release before a Notary Public.[2] Before signing the release, Santiago specifically asked Mrs. Lobaton whether she fully understood the meaning of the release, to which she replied that she did. The release, which she signed, was written in Spanish and states,
 
 
 5
 I have read this document carefully and the content has been explained to me for which reason I release and waive any possible rights of legal action in any jurisdiction for this fact.
 
 
 6
 After the release was signed and payment made, Santiago helped establish trust accounts for Mrs. Lobaton's seven children and explained that the interest on those accounts could be used for the maintenance of the children without invading the principal.
 
 
 7
 On June 10, 1976, Lampsis initiated the instant action in the District Court for the Southern District of New York to obtain exoneration from or limitation of liability in accordance with Liberian Maritime Law and Rule F of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure. Service was made to all known claimants and notice was given in the New York Law Journal.
 
 
 8
 On July 30, 1976, Mrs. Lobaton filed an answer and a claim for compensatory damages of $750,000 as well as for punitive damages. Lampsis responded by raising the defenses of accord and satisfaction and release and by moving for summary judgment. In a memorandum dated September 1, 1978, Judge Owen granted the motion and Mrs. Lobaton appealed.
 
 
 9
 In this appeal, she advances three arguments: (i) a release by a relative of a seaman should be as closely scrutinized as a release executed by the seaman himself; (ii) summary judgment was improper because material issues of fact remain in dispute; and (iii) the release was based on a mutual mistake of fact, namely that Lobaton was not covered by the Greek Seamen's Union Collective Agreement. We reject these claims.
 
 DISCUSSION
 
 10
 Mrs. Lobaton contends that the release in the present case should be subject to the same judicial scrutiny as a release executed by a seaman and, because of this, Lampsis bears the burden of proving that the release was validly executed. Admiralty law provides special protection for seamen. They are treated as "wards" of the admiralty court, Garrett v. Moore-McCormack, Inc., 317 U.S. 239, 246, 63 S.Ct. 246, 251, 87 L.Ed. 239 (1942) (quoting Harden v. Gordon, 2 Mason 541, 11 F.C.A.S. 480 (No. 6047) (C.C.Me.1823)), owing to such factors as their "alleged propensity towards 'rashness' and 'credulity,' " Capotorto v. Compania Sud Americana de Vapores, 541 F.2d 985, 987 (2d Cir.1976) (quoting Brown v. Lull, 4 Fed.Cas. 407, 409 (No. 2018) (C.C.D.Mass.1836)), "their nomadic nature and the perils they encounter at sea," Harris v. Lykes Bros. Steamship Co., 375 F.Supp. 1155, 1157 (E.D.Tex.1974), and "[t]he particularly authoritarian relationship of shipowners and their representatives to seamen and the isolation of the latter from the legal, economic and psychological support of a landbased community." Capotorto, 541 F.2d at 987. However, none of these factors apply to relatives of seamen who are members of the "landbased community" with ready access to the advice of friends and the guidance of counsel. Because the privileges accorded to seamen are personal and arise from the sailor's own peculiar status, we have expressly refused to extend the strict scrutiny of seamen's releases to non-seamen, in particular to longshoremen, Capotorto, 541 F.2d at 987. See Ying Shine Jyu Fen v. Sanko Kisen (U.S.A.) Corp., 1977 AMC 1224, (S.D.N.Y.1977) ("no independent authority" for the proposition that seamen's representatives' releases "are subject to the same scrutiny as seamen's releases.") The Fifth Circuit appears to have adopted the contrary view. Lewis v. S.S. Baune, 534 F.2d 1115, 1123 (5th Cir.1976). Nevertheless, following Capotorto, we decline to extend the strict scrutiny rule relating to seamen's releases to their relatives.
 
 
 11
 Mrs. Lobaton also contends that the District Court erred in granting summary judgment because disputed issues of fact material to her claims exist. We disagree. It is true that summary judgment may be granted only when "there is no genuine issue as to any material fact," Fed.R.Civ.P. 56(c), but the factual claims raised by Mrs. Lobaton are not material to the issues at hand.
 
 
 12
 Her affidavit states, "the company representative said that they were looking out for my interest and that I did not need a lawyer." Assuming that fact to be true for purposes of this motion, it is insufficient to prove that she was induced to forego the assistance of counsel during settlement negotiations and agreed, as a consequence, to an unfair settlement. First, a release and settlement executed by the relatives of a deceased seaman is not inherently unfair simply because it was concluded without the benefit of counsel. Second, Mrs. Lobaton nowhere states facts which show that she was the victim of overreaching, was somehow coerced into entering the agreement or was in any way incompetent. The settlement negotiations entailed several meetings, all of which took place in Mrs. Lobaton's own home and in her native language, and she had more than adequate opportunity to reflect on the matter and to consult friends and advisors. Nor was the substance of the settlement unfair. Even assuming constant overtime and bonuses, which are in fact irregular increments to any income, Mr. Lobaton's top salary was $8,800 a year, or $733 a month. It can be assumed that he would not send his full salary check to his wife but, rather, would retain some money for personal expenses while in port. Moreover, a settlement obtained by a lawyer would be reduced by the amount of his or her fee. At present interest rates, $30,000 will provide an income to Mrs. Lobaton of somewhat over one-third of her deceased husband's highest monthly salary without invasion of the principal. While this amount is less than she would receive if totally successful in her litigation, it is not unfair in light of the uncertainty as to the outcome of that litigation. Should the shipowner prevail in its motion for exoneration, a result which is by no means improbable, its liability will be limited solely to the present value of the DROSIA, which is currently resting on the floor of the Atlantic, 40 miles off Cape Hatteras. Had Mrs. Lobaton not settled, exoneration would have left her with nothing. This explains, we believe, why many of the families of the other deceased seamen, several of whom acted on competent legal advice, settled for less than Mrs. Lobaton.[3]
 
 
 13
 Mrs. Lobaton's final argument is that the release should be rescinded because it was based on a mutual mistake of fact. She contends that the parties did not realize that the Greek Seamen's Collective Agreement governed her husband's wage rate and that the misapprehension as to his proper wage affected the terms of the settlement and release. Judge Owen in fact denied Lampsis' motion for summary judgment as to three other deceased members of the DROSIA's crew on those grounds. In those cases, however, the wages actually paid the seamen were considerably less than those specified in the Greek Seamen's Agreement. A settlement based on actual rather than contract wages might well have underestimated the earning potential of those deceased seamen. In Lobaton's case, however, his actual wages were approximately what he would have been entitled to under the Greek Seamen's Agreement, if not somewhat higher. Misapprehension concerning the applicability of the Agreement could not, therefore, have affected the settlement and is not grounds for rescission.
 
 
 14
 Affirmed.
 
 
 15
 ROBERT J. WARD, District Judge, dissenting.
 
 
 16
 I respectfully dissent.
 
 
 17
 Under Rule 56(c), Fed.R.Civ.P., summary judgment can only be granted in a case in which "there is no genuine issue as to any material fact." In considering such a motion, the court "must resolve all ambiguities and draw all reasonable inferences in favor of the party against whom summary judgment is sought ... with the burden on the moving party to demonstrate the absence of any material factual issue genuinely in dispute." Heyman v. Commerce and Industry Insurance Co., 524 F.2d 1317, 1320 (2d Cir.1975). Therefore, "when the party against whom summary judgment is sought comes forth with affidavits or other material ... that generates uncertainty as to the true state of any material fact, the procedural weapon of summary judgment is inappropriate." Quinn v. Syracuse Model Neighborhood Corp., 613 F.2d 438, 445 (2d Cir.1980).
 
 
 18
 Viewing the instant appeal in light of this clear standard, I do not understand why this Court has chosen to affirm the District Court's order granting summary judgment against appellant ("Mrs. Lobaton").[1] In response to Mrs. Lobaton's claim for wrongful death of her seaman husband, appellee ("Lampsis") asserted the defense of accord and satisfaction and a general release signed by Mrs. Lobaton for the sum of $30,000. In her affidavit in opposition to Lampsis' motion for summary judgment, Mrs. Lobaton stated that "the company representative said that they were looking out for my interest and that I did not need a lawyer." The District Court, finding this statement to be ambiguous, resolved the perceived ambiguity by explicitly relying upon and crediting the affidavit of Lampsis' claim agent. In that affidavit, the agent stated that Mrs. Lobaton "was never told by him or anyone else in his presence that she should not obtain a lawyer and that there was no attempt made to persuade her not to engage a lawyer."
 
 
 19
 Drawing all reasonable inferences in Mrs. Lobaton's favor, as we must, it appears that she is an unsophisticated widow who, at the time the release was signed, had suffered the sudden loss of her husband, was responsible for the welfare of her seven children, and presumably knew nothing of legal or business negotiations and transactions. Plainly, her above-quoted affidavit "generated uncertainty" as to whether the release was a product of overreaching.[2] Because overreaching would upset the validity of the release, the overreaching issue is material to this litigation. Thus, in finding no overreaching in the face of the uncertainty generated by Mrs. Lobaton's affidavit and the reasonable inferences therefrom, the District Court found material facts adversely to the party against whom the motion for summary judgment was made, in direct contravention of Rule 56 and the established law of this Circuit. This error alone requires reversal of the District Court's judgment.
 
 
 20
 This Court's affirmance of the District Court's decision based on the mutual mistake of fact argument similarly runs afoul of the dictates of Rule 56. A mutual mistake of fact entitles a party to rescission if the mistake is material to the bargain entered into by the parties. In affirming the decision below, the majority essentially reasons that a mistake as to the applicability of the Greek Seaman's Collective Agreement ("Agreement") to non-Greek seamen is not material as to Mrs. Lobaton, because Mr. Lobaton's actual wages approximated those he would have received under the Agreement. As a result, "misapprehension concerning the applicability of the Agreement could not ... have affected the settlement" accepted by Mrs. Lobaton, in contrast to those settlements agreed to by the representatives of the other three seamen.
 
 
 21
 However, in order to defeat a motion for summary judgment based on this mutual mistake argument, Mrs. Lobaton had to raise only a genuine issue of material fact as to whether the mutual mistake of fact was itself material. In other words, the majority's analysis is only correct if no genuine issue was raised as to the material fact of whether Mr. Lobaton would have earned more money under the Agreement, because in order for the mutual mistake to have been non-material and hence not a basis for rescission, there had to have been no significant difference between the amount actually received by Mr. Lobaton and that which he would have received under the Agreement.
 
 
 22
 In opposing the motion for summary judgment, Mrs. Lobaton acknowledged that Mr. Lobaton's wage voucher showed that the sums paid to him were at or near the rate called for by the Agreement. However, she also submitted an affidavit of a Mr. Varras, a representative of the Greek Seaman's Union, that listed many fringe benefits that Mr. Lobaton was not receiving but which were provided for mariners under the Agreement. These benefits, which would have amounted to many thousands of dollars over Mr. Lobaton's remaining 23-year working life expectancy, included a Sunday allowance of 11% of base wages, 2 1/2 days' wages for each month of vacation, a long service bonus, and a 45-day wage and food allowance if termination of employment occurred outside of Europe. Thus, Mrs. Lobaton at the very least cast into doubt the material factual issue as to whether Mr. Lobaton actually received approximately the same amount of money he would have received under the Agreement. Again, in order to defeat a motion for summary judgment against her, this is precisely what Mrs. Lobaton needed to do; nonetheless, for some reason the majority has chosen under these circumstances to affirm the District Court's order granting summary judgment.
 
 
 23
 There is no doubt that summary judgment, when appropriately granted, is an important device in the promotion of judicial efficiency in the trial courts. However, Mrs. Lobaton has raised genuine issues of material facts with respect to both the overreaching and mutual mistake of fact defenses, thus precluding summary judgment against her. Because I agree with this Circuit's rule that "it is the very purpose of the trial to establish which party's version of the contested circumstances best comports with reality," Quinn v. Syracuse Model Neighborhood Corp., supra, 613 F.2d at 445, I would reverse the judgment below.
 
 
 
 *
 The Honorable Robert J. Ward, District Judge, Southern District of New York, sitting by designation
 
 
 [1]
 Both Pitman and Santiago, who had formerly practiced law in Cuba and was a Miami based investigator of maritime claims, were fluent in Spanish and English
 
 
 [2]
 In Colombia, a Notary is required to be a licensed attorney
 
 
 [3]
 For example, the mother and common law wife and two children of Saul Ortega Flores received a total of $20,000, with $4,000 going to the mother, who had counsel. Rolando Galdamez Nasser left only his father who settled for $16,000 on the advice of Efram Alcantera, Manager of the Honduran Steamship Company. Ramirez Ramos' rather complicated family situation resulted in a $33,000 settlement on his seven (and possibly nine) dependents of whom five were his minor children with the aid of a local attorney. Oscar Vasquiz left his father and five siblings, all of whom were partly dependent upon him for support. The father consulted an attorney and settled for a $15,000 payment
 
 
 [1]
 In light of this clear legal standard, it is also difficult to understand why this Court has even reached the question of what level of scrutiny should be applied to the seamen's releases in this case. It is true that if Mrs. Lobaton's release were scrutinized under a heightened standard, it is unlikely that summary judgment could appropriately be granted against her, given the "ward of the court" precedents cited by the majority. However, it does not follow that, if heightened scrutiny were not applied, summary judgment would be appropriate against Mrs. Lobaton. On the contrary, the determination of a summary judgment motion depends initially on whether a genuine issue exists as to a material fact, and then on whether the movant is entitled to judgment as a matter of law. In the instant case, for example, if Mrs. Lobaton were found to have raised a genuine issue of material fact with respect to the overreaching defense to the release's validity, even ordinary scrutiny would preclude the granting of summary judgment against her. Alternatively, if Mrs. Lobaton were found not to have raised a genuine issue of material fact, then the question of the level of scrutiny is not even reached. In either case, therefore, the level of scrutiny is not an issue in a summary judgment motion made by Lampsis against Mrs. Lobaton
 
 
 [2]
 The majority seems to make much of the debatable notion that $30,000 was a fair settlement and that therefore overreaching did not occur. Although the amount of the settlement might well have some bearing upon the merits of whether overreaching actually occurred, it certainly does not negate the genuine issue of material fact as to overreaching that Mrs. Lobaton has raised in opposition to the motion for summary judgment