**In re Ruby G. EMANUEL, Debtor.**

**No. 97–44969 (SMB).**

United States Bankruptcy Court,
S.D. New York.

Dec. 23, 2009.

Wilmer Cutler Pickering Hale and Dorr LLP, New York, NY, Andrew N. Goldman, Esq., Charles C. Platt, Esq., Melanie J. Dritz, Esq. Of Counsel, Attorneys for Jacoby & Meyers LLP.

Richard Tanenbaum, Esq., Brooklyn, NY, Attorney for Kenneth Heller.

Susan Harmon, Esq., Hoboken, NJ, Attorney for Kenneth Heller.

Windels Marx Lane & Mittendorf, LLP, New York, NY, Howard L. Simon, Esq. Of Counsel, Office of the United States Trustee, New York, NY, Greg Zipes, Esq. Of Counsel, Attorneys for Trustee.

## POST–TRIAL FINDINGS OF FACT AND CONCLUSIONS OF LAW

STUART M. BERNSTEIN, Chief Bankruptcy Judge.

Kenneth Heller ("Heller") represented the debtor and the estate in a wrongful

death action until he was disbarred. Substitute special personal injury counsel, Jacoby & Meyers ("J & M"), settled the litigation, and Heller now seeks fees and expenses under a theory of *quantum meruit*. Any award will reduce the amount of J & M's contingent fee, and J & M has vigorously opposed Heller's application. Alan Nisselson, Esq., the chapter 7 trustee (the "Trustee"), and the United States Trustee also oppose his application. The Court conducted a one-day evidentiary hearing, and concludes, for the reasons that follow, that Heller is not entitled to any fees or expenses.

## BACKGROUND

### A. The State Court Action

This matter has its origins in an unfortunate, fatal accident involving the debtor's husband. On December 17, 1992, Mr. Emanuel's employer was performing repairs on a barge in dry dock at the Brooklyn Navy Yard. The task called for the placement of a gangway connecting the barge to the dock. Mr. Emanuel was charged with the responsibility of placing the gangway. While standing on the gangway as it was being hoisted into place, Mr. Emanuel fell 45 feet to the bottom of the dry dock, sustaining massive injuries that rendered him a quadriplegic and ultimately led to his death on August 30, 1994. *Emanuel v. Sheridan Transp. Corp.*, 10 A.D.3d 46, 779 N.Y.S.2d 168, 170–71 (N.Y.App.Div.2004) ("*Emanuel I*").

The debtor retained Heller, individually and as administratrix of her husband's estate, to file a wrongful death action. Heller commenced suit against the barge owner, among others, asserting claims under the Jones Act, New York Labor Law and in negligence (the "Action"). Prior to the trial, on July 28, 1997, the debtor filed a voluntary petition for relief under chapter 7. By order dated August 10, 1999, the Trustee retained Heller (and Samuel Hirsch) as special personal injury counsel to the Trustee to prosecute the Action.[1]

The Action was tried before a jury in 1999. The Jones Act and New York Labor Law claims were dismissed before trial, *id.* at 171, and the plaintiffs proceeded to trial on the negligence claim. The jury found the barge to be unseaworthy and the defendants to be negligent. It awarded $24,967,660 in damages, but the trial court reduced the amount to $7,613,566, which the plaintiff accepted under protest. Following the entry of judgment, both sides appealed.

In May 2004, the Appellate Division reversed and remanded for a new trial. The substance of the reversal turned on the erroneous treatment of Mr. Emanuel as a seaman rather than as a longshoreman. According to the Appellate Division, a vessel owner owes an obligation of seaworthiness, a strict liability doctrine, to a seaman. *See id.* at 172–73. A longshoreman, on the other hand, may only recover from a vessel owner if he can prove negligence. *Id.* at 173. The appellate court concluded that Mr. Emanuel was a longshoreman rather than a seaman, *id.* at 172–73, and accordingly, the trial court erred in submitting the question of seaworthiness, which it intertwined with the issue of negligence, to the jury. *Id.* at 172, 173–74. One judge dissented in part, concluding that the record contained no evidence of the defendants' negligence, and the case should, therefore, be reversed and dis-

---

1. The parties did not submit the Trustee's application to retain Heller or the retention order, but all agree that his retention was on a contingency fee basis. The trial was already underway when the Court signed the retention order, and the record does not indicate whether the retention was *nunc pro tunc* to an earlier date.

missed rather than remanded for a new trial. *Id.* at 182.

## B. Heller's Disbarment and Subsequent Contempt

Approximately one month after the Appellate Division reversal, Heller was disbarred. The charges that triggered the disbarment were unrelated to the Emanuel case. The referee had sustained the majority of the charges following an evidentiary hearing, but recommended only a two-year suspension. The Appellate Division disagreed. Citing Heller's pattern of misconduct, "utter contempt for the judicial system" and "his consistent, reprehensible, unprofessional behavior," the court concluded that he should be disbarred rather than suspended:

> In light of the cumulative evidence of respondent's 24–year history of sanctions, his perverse and persistent refusal to accept adverse rulings, reflective of an utter contempt for the judicial system, and his consistent, reprehensible, unprofessional behavior, which has included screaming at, threatening and disparaging judges, adversaries and experts, intentionally defying court rulings, and disrupting and thwarting proper legal process through both physical and verbal aggression, we are of the opinion that the appropriate sanction here is disbarment.

*In re Heller*, 9 A.D.3d 221, 780 N.Y.S.2d 314, 319 (N.Y.App.Div.), *leave to appeal denied*, 3 N.Y.3d 607, 785 N.Y.S.2d 25, 818 N.E.2d 667 (2004).

Following Heller's disbarment, the Court approved the retention of J & M as substitute special personal injury counsel to the Trustee under a contingency fee retainer.[2] (*Order for the Retention of Substitute Special Personal Injury Counsel to the Trustee*, dated Jan. 21, 2005 (ECF Doc. # 23).) J & M sent a letter to Heller requesting the files in the Emanuel case. (Trial Transcript, dated July 1, 2009 ("Tr.") at 197.) The request is a common one, made by substituted plaintiff's counsel in personal injury and wrongful death cases. The terminated lawyers normally send their files promptly to the new counsel to be sure that the interests of the client are protected. (Tr. 194.) Heller nevertheless refused. (Tr. 127, 130.)

J & M then obtained an order to show cause to be substituted as counsel of record for Emanuel and to compel Heller to turn over the case files in the Action.[3] Heller opposed the motion, and crossmoved for an order fixing his costs and disbursements in the sum of $300,000 to $400,000 immediately, fixing his *quantum meruit* fee in the sum of $12,184,332.50, and directing that J & M pay the fee immediately, or secure the obligation, as a condition to the release of the files.[4] (*J & M Findings*, Ex. 8 at 1–2.) In affidavits filed in support of his cross-motion, Heller represented that the case file consisted of

---

2. The debtor had separately retained J & M on August 23, 2004. (*Application for the Retention of Substitute Special Personal Injury Counsel to the Trustee Pursuant to Bankruptcy Code § 327(e)*, dated Jan. 18, 2005, at Ex. A (ECF Doc. # 22).)

3. The opposition to Heller's fee request is based on events that took place in the New York Supreme Court. The Court takes judicial notice of the contents the state court records.

4. Less than a year earlier, Heller had sought similar relief. At that time, he represented to the state court that his *quantum meruit* fee was only $2 million. (*Jacoby & Meyers LLP's Post–Trial Memorandum in Support of Proposed Findings of Fact and Conclusions of Law*, dated July 17, 2009 ("*J & M Findings*"), Ex. 4, at 6; Ex. 5, at 1; Ex. 6, at 1 (ECF Doc. # 107).)

43 boxes in his possession. (*See id.*, Ex. 8 at 6; Ex. 9 at ¶ 58.)

On January 13, 2006, the New York Supreme Court issued an order substituting J & M as counsel for the plaintiff and directing Heller and his associate, Susan Harmon, Esq. ("Harmon"), "to turn over the complete, original file of the underlying action to Jacoby & Meyers LLP ... by 2/13/06. Failure to timely comply and completely comply with the above will result in sanctions." Finally, all other aspects of the cross-motion were denied. (*Id.*, Ex. 10 (the "January 2006 Order").)

Heller and Harmon failed to comply with the January 2006 Order. (Tr. 199.) As a consequence, the New York Supreme Court issued an order on March 28, 2006, directing Heller and Harmon to show cause why they should not be held in contempt for disobeying the January 2006 Order. (*J & M Findings*, Ex. 11.) It is not clear how the order to show cause was resolved, but on December 26, 2006, a second order was issued by the New York Supreme Court directing Heller to show cause why he should not be held in contempt for disobeying the January 2006 Order. (*Id.*, Ex. 14.)

This time, Heller was held in contempt of court by order dated January 26, 2007 (the "Contempt Order") (*id.*, Ex. 15), for failing to turn over the files to J & M. The Contempt Order stated that Heller could purge himself of the contempt by turning over all his records within 20 days.

Should he fail to comply, a warrant would issue for his arrest and production for sentencing or fine, or both.

Heller failed to purge himself of the contempt, and state Supreme Court Justice Silver issued a warrant for Heller's arrest on February 26, 2007. *In re Emanuel*, 406 B.R. 634, 635 (Bankr.S.D.N.Y. 2009) ("*Emanuel II*"). Heller was arrested that same day, and was subsequently sentenced to 30 days in jail and a $10,000 fine (the "Sentencing Order"). *Id.* The Appellate Division granted an interim stay limited to Heller's incarceration, but the interim stay was dissolved when his motion for a stay pending appeal was denied on May 8, 2007. *Id.*

On January 29, 2009, the Appellate Division affirmed the Contempt Order and the Sentencing Order, stating that Heller's failure to comply with successive orders directing him to turn over his files to Jacoby caused "resulting prejudice to plaintiff's right to a new trial in this action for maritime wrongful death." *Emanuel v. Sheridan Transp. Corp.*, 58 A.D.3d 583, 870 N.Y.S.2d 912, 913 (2009) ("*Emanuel III*").

## C. The Settlement

Deprived of Heller's files, J & M carried on the best it could relying on the Record on Appeal.[5] Eventually, it procured a $3.65 million settlement that the Trustee accepted. On August 18, 2008, the Trustee filed a motion before this Court to

---

5. Oddly, Heller may have been the only person who still had files that were not part of the Record on Appeal. The defendants were represented by Hill, Betts & Nash whose files were destroyed in the World Trade Center attack on September 11, 2001. (*Trustee's Motion for: (I) Approval of Settlement of the Debtor's Wrongful Death Actions Pursuant to Federal Rule of Bankruptcy Procedure 9019(a); (II) Approval of Allowance and Payment of Fees and Expenses of Special Personal Injury Attorneys to the Trustee Pursuant to a Contingency Fee Agreement and Under Bankruptcy Code §§ 328 and 330; (iii) a Determination of the Amount of Compensation, if any, of Kenneth Heller, Former Special Counsel to the Trustee; (iv) a Determination of the Amount of the Lien of New York State Insurance Fund; (v) Partial Payment of a Surplus to The Debtor; and (vi) Such Other relief as the Court Deems Just*, dated August 13, 2008 ("*Trustee's 9019 Motion*"), Ex. D (ECF Doc. # 27).)

approve the settlement, pay J & M a contingent fee and expenses in the respective amounts of $1,214,318.62 and $6,679.80, deny compensation to Heller, pay a lien in the amount of $700,000 and partially pay the surplus of $1,600,000 to the debtor. (*Trustee's 9019 Motion*, at 1.) Heller objected, but it is unnecessary to recount his reasons.[6] (*See Objection of Kenneth Heller to the Trustee's Motion for Approval of Settlement of the Debtor's Wrongful Death Actions*, dated Sept. 23, 2008 (ECF Doc. # 29).) By order dated November 10, 2008, the Court approved the settlement, and authorized the Trustee to pay the lien held by the New York State Insurance Fund in the amount of $700,000 and $1,550,000 to the debtor. (ECF.Doc.# 45.) The Court reserved decision on the allocation of the fees as between Heller and J & M since an evidentiary hearing was necessary to resolve Heller's *quantum meruit* claims.

## DISCUSSION

### A. Threshold Matters

■ Before turning to the merits, the Court must first deal with two threshold arguments. J & M contends that the New York State courts have already ruled that Heller is not entitled to a legal fee. The state court, however, was presented with and decided a different issue. After J & M moved to compel Heller to turn over his files, Heller cross-moved for an order com-

pelling the payment of his expenses, and the fixing and securing of his legal fee *before* he was obligated to turn over his files. The state court denied Heller's cross-motion, and directed him to turn over his files, essentially refusing to recognize a retaining lien. The state court never ruled that Heller was not entitled to a legal fee.

■ J & M also argues that Heller failed to comply with the requirements imposed on fee applicants in this Court. Heller was presumably retained pursuant to 11 U.S.C. § 327(e) as special personal injury counsel to the Trustee.[7] Although Heller started working on the matter prepetition, he rendered a substantial amount of services as special counsel to the Trustee. He now seeks an award, based on *quantum meruit*, for those services.

Rule 2016(a) of the Federal Rule of Bankruptcy Procedure states that any entity seeking compensation from the estate for services rendered or reimbursement of necessary expenses must "file an application setting forth a detailed statement of (1) the services rendered, time expended and the expenses incurred, and (2) the amounts requested." The rule applies to professionals who are retained pursuant to pre-approved contingency fee agreements. *In re Lenworth Westbrooks*, 202 B.R. 520, 522 (Bankr.N.D.Ala.1996). It even applies to persons who did not represent the estate but seek compensation under 11

---

6. Giving him the benefit of the doubt, Heller's motivation was a concern that the debtor was a seaman's widow, and hence, a "ward of admiralty." As such, a release of her rights was subject to special scrutiny.

   Putting to one side the question of Heller's standing to raise Mrs. Emanuel's personal rights, his argument suffered from two flaws. First, a seaman's special status is personal, and his widow is not a "ward of admiralty" entitled to special protection. *Lampsis Navigation Ltd. v. Ortiz De Cortes*, 694 F.2d 934,

936 (2d Cir., 1982). Second, and more important, the Appellate Division determined that Mr. Emanuel was a longshoreman, not a seaman. A longshoreman is not a "ward of admiralty," and his release of personal injuries—even those sustained aboard a vessel—is not entitled to strict scrutiny. *Capotorto v. Compania Sud Americana de Vapores, Chilean Line, Inc.*, 541 F.2d 985, 987 (2d Cir.1976).

7. As noted, neither side supplied the Heller retention application or retention order.

U.S.C. § 503(b)(3). 9 ALAN N. RESNICK & HENRY J. SOMMER, COLLIER ON BANKRUPTCY ¶ 2016.03, at 2016–6 (15th ed. rev. 2009). The rule unquestionably applied to Heller.

Heller failed to submit a fee application in accordance with Federal Bankruptcy Rule 2016(a). Nevertheless, the Court afforded him an opportunity to prove his entitlement to fees at a trial, and accordingly, will resolve the dispute on the merits.

## B. Heller's *Quantum Meruit* Fee

### 1. Introduction

██ A disbarred attorney may be compensated on a *quantum meruit* basis for services rendered prior to his disbarment, N.Y. COMP.CODES R. & REGS., tit. 22, § 603.13(b) (2009) (Rules of First Department); N.Y. COMP.CODES R. & REGS., tit. 22, § 691.10(b) (2009) (Rules of Second Department); *see generally* 7 N.Y.JUR.2D, ATTORNEYS AT LAW § 264, at 174 (2009), provided the misconduct does not relate to the representation for which compensation is sought. *In re Bagen,* 201 B.R. 642, 644 (S.D.N.Y.1996); *Decolator, Cohen & DiPrisco, LLP v. Lysaght, Lysaght & Kramer, P.C.,* 304 A.D.2d 86, 756 N.Y.S.2d 147, 150 (N.Y.App.Div.2003). An award in *quantum meruit* should in all cases reflect the courts assessment of the qualitative value of the services rendered, made after weighing all relevant factors considered in valuing legal services. *Padilla v. Sansivieri,* 31 A.D.3d 64, 815 N.Y.S.2d 173, 174 (N.Y.App.Div.2006). The relevant factors include the difficulty of the matter, the nature and extent of the services rendered, the time reasonably expended on those services, the quality of performance by counsel, the qualifications of counsel, the amount at issue, and the results obtained (to the extent known). *Sequa Corp. v. GBJ Corp.,* 156 F.3d 136, 148 (2d Cir. 1998); *accord The Dweck Law Firm,*

*L.L.P. v. Mann,* No. 03 Civ. 8967(SAS), 2004 WL 1794486, at *2 (S.D.N.Y. Aug.11, 2004); *Decolator,* 756 N.Y.S.2d at 151; *Rosenzweig v. Gomez,* 250 A.D.2d 664, 672 N.Y.S.2d 907, 908 (N.Y.App.Div.1998).

██ Where the discharged attorney had been employed under a contingency fee agreement, the Court may take that into account in determining the value of the services rendered, but the *quantum merit* recovery does not depend on the terms of the agreement. *Dweck Law Firm,* 2004 WL 1794486, at *2. It should be borne in mind that the disbarred attorney must be replaced as the result of his own misconduct, and stands in the same shoes as one who has abandoned his client. *See In re Woodworth,* 15 F.Supp. 291, 293 (S.D.N.Y.), *aff'd,* 85 F.2d 50 (2d Cir.1936). Although his disbarment does not necessarily foreclose compensation, it nevertheless forces the client to retain a second lawyer to complete the work, and the client should not have to pay twice. Accordingly, in a personal injury action in which all relevant agreements provided for a compensation on a contingent fee basis, ... compensation to disbarred, outgoing counsel should be fixed in *quantum meruit* as a portion of the contingent fee. *Padilla v. Sansivieri,* 815 N.Y.S.2d at 174; *accord Decolator,* 756 N.Y.S.2d at 151.

### 2. The Evidence

██ I have no reason to doubt that Heller possessed the skill and experience to try the Emanuel case in state court, although his self-proclaimed reputation as "one of the preeminent maritime attorneys in the United States," (*Creditor Kenneth Heller's Memorandum in Support of Post–Trial Findings of Fact and Conclusions of Law to Fix Attorney Compensation,* dated July 30, 2009, at ¶ 28) (ECF

Doc. # 118), is hyperbole.[8] I also do not doubt that he put a significant amount of time into the case or that the amount at issue was substantial. However, the party seeking legal fees bears the burden of proof, *D'Jamoos v. Griffith*, No. 00 CV 1361(ILG), 2008 WL 2620120, at *3 (E.D.N.Y. Feb.29, 2008), and I conclude that Heller failed to prove the amount, value or benefit of his services.

■ Heller did not testify at trial, fearing that he would be arrested pursuant to an outstanding warrant issued after he was held in contempt for refusing to turn over his records in this matter to J & M. *See Emanuel II*, 406 B.R. at 637. Instead, the only evidence of what he did came from Harmon, a trial witness,[9] and the non-contemporaneous time records she created and the Court received as Heller Trial Exhibit A ("Exhibit A").

Neither the time records nor Harmon's testimony were probative or credible. Exhibit A consisted of 143 pages that purported to detail the date of each service, a description of the service and the amount of time expended on the service. It was created in August 2005, (Tr. 74), and depicted services rendered as far back as 1992. Although Harmon testified that she based the time entries on her memory of what had occurred, (Tr. 108–09), she acknowledged that she had no current recollection. (Tr. 109.) She could not even confirm that Exhibit A included the same time records that she said she had prepared back in 2005.[10] (Tr. 101–02, 103) She described the time entries as "rough estimates," (Tr. 108), and "guesses," (Tr. 119), and conceded that she assigned time "arbitrarily." (Tr. 107.) Heller's trial counsel described the time records as "a quick and dirty way of putting this together. Everything was compiled years after the events." (Tr. 168.)

**8.** John D. Coulter, Esq., a maritime attorney, testified that Heller had been "considered one of the preeminent maritime attorneys in New York City ... [i]n the country, really." (Tr. 17.) He did not explain how he reached this conclusion or with whom he had discussed Heller's reputation. In addition, Coulter has apparently been working with Heller on this matter, and was charging him $200.00 per hour for his testimony. (Tr. at 38.) While Coulter was sincere, I attribute his high esteem of Heller to his loyalty to one who is essentially his client.

**9.** Saul Rudes, Esq., wrote to the Court after the trial, requesting an opportunity to be heard and making certain statements, some evidentiary in nature, regarding why Heller should receive a substantial fee. (*Letter*, dated July 9, 2009 (ECF Doc. # 102).) Rudes is a judgment creditor of Heller, but is not a creditor of the estate. As a creditor of a creditor, he lacks standing to be heard. *See In re Comcoach Corp.*, 698 F.2d 571, 573–74 (2d Cir.1983) ("Bankruptcy Courts were established to provide a forum where creditors and debtors could settle their disputes and thereby effectuate the objectives of the statute. Necessarily, therefore, the Bank must be either a creditor or a debtor to invoke the court's jurisdiction."); *Southern Blvd., Inc. v. Martin Paint Stores*, 207 B.R. 57, 61 (S.D.N.Y. 1997) ("A creditor, under the Code, is one who has a claim *against the debtor* or the estate. The concept does not, according to the Second Circuit, encompass a creditor of one of the debtor's creditors.") (emphasis in original) (internal citations omitted). Furthermore, to the extent he had relevant evidence to offer regarding Heller's *quantum meruit* fee, the place to do so was at the trial. Accordingly, the Court disregards his unsworn, post-trial "testimony."

**10.** The same or similar records had been submitted to the New York Supreme Court in the course of Heller's efforts to fix the amount of his charging and retaining liens. At trial, Harmon was confronted with an affidavit that she prepared, Heller signed and both submitted to the state court, stating that Heller had reviewed the files and prepared what became Exhibit A. She conceded that the affidavit was "literally not true," invoked the Fifth Amendment and refused to answer any further questions on the subject. (Tr. 60.)

The time records were also inaccurate on their face. They included entries relating to services rendered prior to the accident and after Heller's disbarment. (Tr. 69–70, 123, 124, 167.) In many cases, the descriptions did not reflect the actual service, (Tr. 91–92, 103, 104, 105–06, 107, 108, 112, 116), the dates on which services were rendered, (Tr. 106, 108, 112), or the actual time spent.[11] (Tr. 165–167, 168.) Pages were also missing. (Tr. 76.)

In addition, Exhibit A contained duplicate entries for the same work. The duplication resulted from the manner in which Harmon reconstructed the time. Harmon began by going through Heller's diaries for the years 1992 through 2004, and estimating the time based on the diary entries. The first half of Exhibit A reflected reconstructed time based on the diary entries. Harmon then went through Heller's boxes, and performed a second estimate of time for work done between 1992 and 2004. These estimates begin on page 78 of Exhibit A. Harmon conceded that there was some overlap, but she never checked for duplication. (Tr. 187–88.)

Based on the foregoing, I decline to credit Harmon's testimony, and at best, I can only infer that Heller obviously spent time on the case because he tried it. He failed, however, to prove the actual amount of time he spent rendering services in the Emanuel case, or even a reasonable approximation of that time. He has also failed to prove the billing rates of all of the attorneys and paraprofessionals, or the value of those services under the "lodestar" method.

Furthermore, Heller has failed to demonstrate that his services provided any benefit to the estate. The Emanuel case was not as complex as Heller makes it sound, although proof of liability posed problems. Mr. Emanuel was a longshoreman. To establish the liability of the vessel owner, the plaintiff had to prove that the vessel owner (1) failed to exercise proper care regarding the condition of the ship prior to turning it over to the stevedore, (2) maintained active control of the vessel following the turnover that negligently contributed to the longshoreman's injury, or (3) had actual knowledge of a dangerous condition in an area under the stevedore's control, and failed to intervene. *Emanuel I,* 779 N.Y.S.2d at 174–75.

The case turned on whether the vessel owner breached its duty of active control to supervise and participate in the securing of the gangway from which Mr. Emanuel fell. *See id.* at 176. Heller submitted, and the trial court gave, a charge that misstated the law. It improperly placed the primary responsibility on the ship owner after the vessel had been turned over to Mr. Emanuel's employer, the stevedore. *Id.* at 175. There was only one eyewitness to the accident, and the balance of the trial testimony involved experts and the parties' employees explaining the appropriate way to secure a gangway. Although Heller prevailed in the trial court, he went forward on a faulty theory and ultimately lost the case.

Having lost the case before he was forced to hand it off, Heller failed to demonstrate that his work provided any benefit to the estate in the continued prosecution of the lawsuit following his

---

11. Harmon contended that she underestimated the amount of time spent on various tasks. The evidence showed, however, that certain entries were wildly excessive. For example, Harmon testified that Heller and his firm spent 80 hours preparing a 14-page document request (Tr. 111), 383 hours preparing an affirmation in opposition to a motion (Tr. 111), 1,000 hours reviewing trial transcripts (Tr. 121), and 2,136 hours preparing a single brief. (Tr. 170.)

disbarment. He refused to turn over his file to J & M, and was held in contempt for that failure. Heller has nevertheless maintained throughout the case that J & M did not need his files, and could have successfully retried the case using the publicly available Record on Appeal. As Heller's work would be reflected in the Record on Appeal, this implies that J & M, who relied on the Record on Appeal, benefited from his work.

I reject this argument for several reasons. First, Heller never offered the Record on Appeal into evidence, and thus, he failed to show what it contained much less that it contained everything that J & M needed.[12] Second, the Record on Appeal could not have included everything in Heller's files. The Record on Appeal filled only one or two boxes, while Heller had 43 boxes. (Tr. 134.) Although Harmon insisted that "the sum and substance of the 41 [other] boxes that was necessary to retry the case was contained in that joint record on appeal," (Tr. 134), I reject her statement as unsupported, unsupportable and self-serving. Third, many items were admittedly not part of the Record on Appeal, including notes of witness interviews, (Tr. 183–84, 186, 202), diary notes, (Tr. 183–84), the portions of depositions that were not read at trial, (Tr. 186), and videos of Mr. Emanuel, photographs, memos and witness statements. (Tr. 200.) Fourth, one Appellate Division judge deemed the trial record insufficient as a matter of law to merit a new trial. While the majority disagreed and remanded the case, the dissenter's view might give successor counsel some pause in simply relying on the trial record.

■ Finally, Heller's post-disbarment conduct caused prejudice to his former clients. Having lost the case he tried, Heller obstructed J & M's attempts to retry the case he lost. His refusal to turn over the files, in the face of several court orders directing him to do so, was symptomatic of what the Appellate Division described as his "utter contempt for the judicial system, and his consistent, reprehensible, unprofessional behavior, which has included ... intentionally defying court rulings" in the Heller disbarment order. *In re Heller*, 780 N.Y.S.2d at 319. Furthermore, although he argued to the Appellate Division, as he does here, that the Record on Appeal included everything that J & M needed to retry the case, (*see J & M Findings*, Ex. 25, at 51–53), the Appellate Division concluded that Heller's contemptuous refusal to turn over the files caused "resulting prejudice to plaintiff's right to a new trial." *Emanuel III*, 870 N.Y.S.2d at 913.[13]

12. Heller served trial subpoenas the day before trial on Hill, Betts & Nash and Carol R. Finocchio, Esq., the defendants' appellate lawyer, to require them to produce the Record on Appeal as well as certain other documents. The Court quashed both subpoenas at the request of the subpoenaed parties. The subpoenas were served the day before trial and demanded records that had been sent to storage. More importantly, the Record on Appeal was publicly available, and Heller could have obtained a copy from the public source. (Tr. 10–11.)

13. Heller's egregious post withdrawal conduct is relevant in fixing his *quantum meruit* fee. *See Williams v. Hertz Corp.*, 91 A.D.2d 548, 457 N.Y.S.2d 23, 25–26 (N.Y.App.Div. 1982) (remanding to the trial court to determine whether former counsel was discharged for cause and if not, to fix his *quantum meruit* fee, based on allegations, *inter alia*, that former counsel had committed post-discharge acts of professional disloyalty, disregarded the client's interest by withholding the file and exhibited professional discourtesy toward substitute counsel), *aff'd*, 59 N.Y.2d 893, 465 N.Y.S.2d 937, 452 N.E.2d 1265 (1983). Ironically, Heller was also the former counsel in *Williams* whose egregious conduct in that case led to the remand.

## CONCLUSION

In the final analysis, Heller spent an indeterminate amount of time on a case that he lost, providing services of unproven benefit to his successor and former client. He irrationally disregarded numerous state court orders directing him to turn over his case files to J & M, resulting in prejudice to the debtor and the estate. These facts mandate the denial of his *quantum meruit* claim for attorney's fees. In addition, Heller failed to offer any evidence of the amount of expenses that he or his firm incurred in connection with the Emanuel case, and his request for reimbursement of expenses is denied for this reason as well.

The foregoing constitutes the Court's findings of fact and conclusions of law. Submit order.